# UNITED STATES DISTRICT COURT
# NORTHERN DISTRICT OF OHIO
# EASTERN DIVISION

### Case No. 1:21-cv-00926

| | |
|---|---|
| **MSP RECOVERY CLAIMS, SERIES LLC,** | |
| **Plaintiff,** | **THIRD AMENDED COMPLAINT** |
| **v.** | |
| **PROGRESSIVE CASUALTY INSURANCE COMPANY, PROGRESSIVE DIRECT INSURANCE COMPANY, PROGRESSIVE EXPRESS INSURANCE COMPANY, PROGRESSIVE NORTHERN INSURANCE COMPANY, and NATIONAL CONTINENTAL INSURANCE COMPANY,** | **DEMAND FOR JURY TRIAL** |
| **Defendants.** | |

## THIRD AMENDED COMPLAINT

Plaintiff, MSP Recovery Claims Series, LLC ("MSPRC"), brings this action against Progressive Casualty Insurance Company, Progressive Direct Insurance Company, Progressive Express Insurance Company, Progressive Northern Insurance Company, and National Continental Insurance Company (collectively, "Progressive" or "Defendants"), and alleges:

## INTRODUCTION

1.      The Medicare program spent $944.3 billion (roughly 21% of the entire federal budget) in fiscal year 2022 to provide health insurance for roughly 65 million people (around 20% of the U.S. population) who are aged 65 and older or have disabilities.[1] With the aging population expected to become nearly a quarter of the U.S. population by 2060 (95 million people), one of

---

[1] https://www.cms.gov/data-research/statistics-trends-and-reports/national-health-expenditure-data/nhe-fact-sheet (last visited April 10, 2024).

1

Medicare's main trust funds is expected to run dry by 2028.[2] For these reasons, identifying and correcting fraud, waste, and abuse—and ensuring that Medicare pays only for bills Congress intended it to pay—is more important now than ever before to ensure the long-term sustainability of an essential federal program that has been in existence since 1965.

2.      More than 40 years ago, in 1980, Congress first addressed fears regarding Medicare insolvency by passing with overwhelming bipartisan support the Medicare Secondary Payer Act (the "MSP Act"). The intent of the MSP Act was to staunch the tide of ballooning medical entitlement costs. Prior to the MSP Act, Medicare paid for all medical treatment within its scope and left private insurers merely to pick up whatever expenses remained. With the MSP Act, Congress mandated that insurers like Defendants—rather than Medicare—would become primarily responsible for medical expenses covered by their insurance policies.

3.      Instead of allowing insurers to accept premiums from their policyholders and then sit back while Medicare paid medical bills covered by the insurers' policies, Congress mandated that the insurers would be the primary payers and Medicare would simply provide a safety net for its beneficiaries in the event the insurance carriers did not promptly pay. In short, Congress intended through the MSP Act to transfer the cost and financial burden of healthcare to private insurance plans who were receiving premiums expressly intended to cover the medical expenses being paid by Medicare prior to the MSP Act. In other words, Congress enacted 42 U.S.C. § 1395y(b)(1) to reduce federal expenditures by making private automobile insurers primarily liable for the cost of servicing their policies.

4.      Subsequently, when Congress created the Medicare Advantage option under Part C

---

[2] https://www.whitehouse.gov/briefing-room/statements-releases/2023/03/07/fact-sheet-the-presidents-budget-extending-medicare-solvency-by-25-years-or-more-strengthening-medicare-and-lowering-health-care-costs/ (last visited April 10, 2024) ("[T]he most recent Medicare Trustees Report projected that the HI Trust Fund would be insolvent in 2028."). The HI Trust Fund provides funding for Medicare Part A services, such as hospital stays.

of Medicare, 42 U.S.C. § 1395w-21(a)(1)(B), it ensured that Medicare Advantage Organizations ("MAOs"), just like Medicare, would be deemed the *secondary payer* when the Medicare beneficiaries' medical expenses are covered concurrently by other insurance policies. 42 U.S.C. § 1395w-22(a)(4). Medicare Part C permits Medicare beneficiaries to choose to receive their health care benefits from private insurers through MAOs. As of July 2023, over 31 million individuals—nearly 40% of all Medicare beneficiaries—had elected to enroll with an MAO and participate in a Medicare Advantage Plan ("MA Plan").

5.     To protect Medicare beneficiaries, Congress authorizes both Medicare and MAOs to go ahead and pay a beneficiary's medical expenses first when a primary payer has not made or cannot reasonably be expected to make payment promptly. 42 U.S.C. § 1395y(b)(2)(B)(i). Such payments are "intended to minimize patient anxiety about the source of payment and to avoid delays in reimbursement for" medical expenses. H.R Rep. No. 97-208, pt. 2, at 956 (1981). However, under the MSP Act, Medicare's and the MAO's payment is conditioned on the primary payer—the insurer—ultimately reimbursing Medicare and the MAO. 42 U.S.C. § 1395y(b)(2)(B)(ii). In this way, Medicare beneficiaries receive the health care they need, but Medicare remains entitled to reimbursement.

6.     Compliance with the MSP Act should lead to tremendous savings for the Medicare program. In 2021, minimal compliance by primary payers resulted in approximately $9.7 billion in savings. However, that's just the tip of the iceberg. According to an industry white paper, approximately 8 to 10% of all healthcare expenditures are related to some type of accident.[3] When a Medicare beneficiary is involved in an automobile accident or slip-and-fall, the beneficiary will almost always be insured for medical expenses either under the beneficiary's own insurance policy or under the policy of a third party. However, as authorized by the MSP Act, Medicare frequently ends

---

[3] https://www.optum.com/content/dam/optum3/optum/en/resources/white-papers/StrengtheningPaymentIntegrity-SubrogtaionInjuryCoverageWhitePaper.pdf, p.2 (last visited April 10, 2024).

up conditionally paying the privately covered medical expenses first. Accordingly, with expenditures over $900 billion, one should expect Medicare and MAOs to be able to recover at least something within the range of 8% of expenditures, which would amount to tens of billions of dollars. Recoveries, however, are not even remotely close to those amounts, because insurers have systematically disregarded their duty to comply with their obligations under the MSP Act.

7.     Through years of investigation, including sending thousands of coordination of benefits letters to insurers across the country, Plaintiff has uncovered two strategies adopted by insurers that have contributed to the depletion of Medicare's trust funds by enabling insurers to evade their primary payer obligations. First, insurers, including Defendants, have done very little to identify or coordinate with MAOs who have made conditional payments, much less reimburse them. Those MAOs are ultimately funded from the same trust funds as Medicare.

8.     Second, insurers, including Defendants, fail to properly report to Medicare their primary payer status and related information as mandated by Section 111 of the Medicare, Medicaid, and SCHIP Extension Act of 2007, PL 110-173 ("Section 111 reporting"). Through Section 111 reporting on a quarterly basis, insurers are supposed to share data with Medicare that allows Medicare to determine whether it made a secondary payment that was in fact the responsibility of another insurer—the primary payer. However, insurers, including Defendants, fail to gather the necessary Medicare information from the injured person or act on the data contained in bills sent to insurers by healthcare providers and, therefore, often do not submit the information to Medicare as mandated by Section 111. This failure is either due to insurers, including Defendants, having flawed systems and faulty data or represents a purposeful effort by them to hide the insurers' primary status from Medicare and MAOs. Without a proper Section 111 report, Medicare—and ultimately MAOs—frequently do not know that they are secondary payers and do not know who the primary payer actually is.

9.     The insurers' strategies, including those of Defendants, have harmed and will

continue to harm Medicare and MAOs across the country.

10.     For that reason, this action seeks to enforce the MSP Act through the Act's private cause of action—enacted specifically to overcome insurers' resistance—by requiring Defendants to do what the MSP Act mandates: identify and reimburse conditional payments made by MAOs when Defendants were the primary payer. The MAOs ("the MAO Assignors")[4] assigned their conditional payment recovery rights to Plaintiff to bring this action.

## PARTIES, JURISDICTION, AND VENUE

11.     MSPRC is a duly organized and existing Delaware series limited liability company with its principal place of business located in Coral Gables, Florida. MSPRC's limited liability company operating agreement provides for the establishment of one or more designated series, as Delaware law permits. Del. Code Ann. Tit. 6, § 18-215(a). Therefore, MSPRC established various designated series to serve as units of the company for the purpose of maintaining various claims recovery assignments separate from other company assets.

12.     All designated series form a part of MSPRC, and MSPRC may receive assignments in its own name of MSPRC and further associate such assignments with a particular designated series, or may have claims assigned directly to a particular designated series. Pursuant to MSPRC's LLC Agreement and applicable amendment(s), MSPRC maintains the legal right to sue on behalf of each of its designated series and pursue any and all rights, benefits, and causes of action arising from assignments to a designated series:

> Without limiting the foregoing, the Company's purposes include owning and pursuing claims recovery and reimbursement rights assigned to the Company or any of its designated series, by Medicare Advantage Organizations … and other health care organizations or providers authorized by state or federal law … to pay for, provide or arrange for the provision of medical and health care services or supplies to persons, including but not limited to those who are covered under government healthcare programs such as Medicare, Medicare Advantage or Medicaid. The

---

[4] One assignor is a risk-bearing Managed Services Organization, but for conciseness, the term "MAO Assignors" will be used throughout the Third Amended Complaint.

> Company will own the assigned rights but may segregate the assignments by establishing series interests pursuant to Title 6, § 18-215 of the Delaware Code to serve as units of the Company. **For avoidance of doubt, the Company is authorized to pursue or assert any claim or suit capable of being asserted by any designated series arising from, or by virtue of, an assignment to a designated series.**

Section 2 of LLC Agreement (amending Section 2.3, entitled "Purpose," to include the language quoted above) (emphasis added).

13. As such, MSPRC has the right and authority to seek reimbursement of Medicare payments made by its designated series' assignors that should have been paid by Defendants in the first instance.

14. After this lawsuit was filed, one of the original named plaintiffs—MSP Recovery Claims Series 44, LLC ("Series 44")—transferred all its assets to MSPRC, including the assignment that gave Series 44 its rights in this lawsuit. On July 18, 2023, Series 44 filed a Certificate of Cancellation with the State of Delaware.

15. The designated series involved in this action are Series 17-03-615 (assignor AvMed); Series 15-09-157 (assignor ConnectiCare); Series 16-08-1483 (assignor Emblem/Health Insurance Plan of Greater New York); Series 17-04-631 (assignor Fallon Community Health Plan); Series 16-11-509 (assignor SummaCare); Series 23-05-1945 (assignor HEAL); Series 23-05-1946 (assignor Health First Health Plan); Series 23-05-1941 (assignor Blue Cross Blue Shield of Rhode Island); Series 23-05-1942 (assignor Blue Cross Blue Shield of Massachusetts); and Series 23-05-1944 (assignor Family Physicians Group d/b/a/ Family Physicians of Winter Park, Inc.)[5].

16. Defendant Progressive Casualty Insurance Company ("Progressive Casualty") is a company that issues liability policies, with its principal place of business at 6300 Wilson Mills Road in Mayfield Village, Ohio.

---

[5] This assignor is a risk-bearing Managed Services Organization.

17.     Defendant Progressive Direct Insurance Company ("Progressive Direct") is a company that issues liability policies, with its address at 6300 Wilson Mills Road in Mayfield Village, Ohio.

18.     Defendant Progressive Express Insurance Company ("Progressive Express") is a company that issues liability policies, with its principal place of business at 6300 Wilson Mills Road in Mayfield Village, Ohio.

19.     Defendant Progressive Northern Insurance Company ("Progressive Northern") is a company that issues liability policies, with its principal place of business in Ohio.

20.     Defendant National Continental Insurance Company ("National Continental") is a company that issues liability policies, with its address at 1300 Walt Whitman Road in Melville, New York.

21.     This Court has subject matter jurisdiction of this action under 28 U.S.C. § 1331.

22.     Venue is proper in this District pursuant to 28 U.S.C. §1391 (b), (c), and (d) because at all times material, Defendants transacted business, were found, or had agents in this District, and a substantial portion of the alleged activity affecting trade and commerce discussed below has been carried out in this District.

23.     This Court has personal jurisdiction over Defendants because at all material times, they have been transacting insurance business throughout the State of Ohio, including but not limited to this District. The claims identified in this pleading arise from Defendants' conduct within this State. Exercising personal jurisdiction over Defendants does not offend traditional notions of fair play and substantial justice.

## THE MEDICARE ADVANTAGE PROGRAM

24.     Medicare enrollees may elect to receive their benefits in one of two ways. First, they may receive their benefits under the traditional Medicare Parts A and B. Known as the Medicare "fee for service" option, Parts A and B provide hospital insurance and coverage for medically necessary

outpatient and physician services. 42 U.S.C. § 1395w-21(a)(1)(A). Under Parts A and B, government contractors pay for Medicare enrollees' expenses directly on a fee-for-service basis. Alternatively, under Medicare Part C, Medicare enrollees may receive their Medicare benefits from private health insurers called Medicare Advantage Organizations or MAOs. 42 U.S.C. § 1395w-21(a)(1)(B).

25.     Congress enacted the Part C "Medicare Advantage" option in 1997 after experts had come to realize that the Parts A and B "fee for service" payment structure encouraged healthcare providers to order more tests and procedures than medically necessary. Through Medicare Advantage, Congress intended to "enable the Medicare program to utilize innovations that have helped the private market contain costs and expand health care delivery options." H.R. Rep. No. 105-217, at 585 (1997) (Conf. Rep.).

26.     Each MAO contracts individually with the Secretary of Health and Human Services. 42 U.S.C. § 1395w-27. Under that contract, the MAO receives a fixed amount per enrollee, based on the plan's enrollees' risk factors and other characteristics, rather than payment of a fee for specific services performed. The MAO must then provide at least the same level of benefits that enrollees would receive under the fee-for-service Medicare Plan A and B option. *See id.* at § 1395w-22. By paying MAOs a fixed amount per enrollee—called a "capitation" payment system—Congress sought to safeguard public dollars while improving the quality of care.

27.     Under a capitation-based system, the MAO provides Medicare benefits in exchange for the fixed monthly fee per person enrolled in the program regardless of actual healthcare usage. MAOs are thus incentivized to provide health insurance more efficiently than under the fee-for- service model. Not only does the Medicare Advantage program stimulate cost savings for the Medicare Trust Fund, but it also promotes creation of additional benefits for Medicare-eligible individuals: "[C]ost savings for the Medicare Trust Fund was not Congress's only goal when it created the MA program. Congress structured the program so that MAOs would compete for enrollees based on how

8

efficiently they could provide care to Medicare-eligible individuals." *In re Avandia Mktg., Sales Pracs. & Prod. Liab. Litig.*, 685 F.3d 353, 365 (3d Cir. 2012).

28.     Achievement of Congress's goals in enacting Medicare Advantage is, however, dependent on MAOs being able to achieve cost savings—like Medicare—through enforcement of the MSP Act by ensuring primary payers, such as Defendants in this case, have reimbursed the MAOs for payments of medical expenses that should have been paid by the insurers who charged premiums specifically to cover those expenses. When MAOs achieve cost savings by recovering conditional payments from primary payers, they can bid to cover Medicare-eligible individuals at an amount lower than CMS's benchmark, which then allows CMS to deposit part of the savings into the Medicare Trust Fund. The MAOs' cost savings also allow MAOs to offer "additional benefits to enrollees not covered by traditional Medicare." *Id.* at 365. While conditional payments recovered by MAOs do not go to Medicare directly, the payments by primary payers do reduce costs, and those savings are passed on to Medicare through reduced costs or to the beneficiaries through expanded services. *See* 42 U.S.C. § 1395w-23.

29.     Even though MAOs have parity of recovery rights with Medicare, insurers such as Defendants have—for more than two decades—continued to disregard their reimbursement obligations to MAOs. That failure, which blocks achievement of Congress' cost-saving goals, depletes the Medicare Trust Funds that support Medicare Advantage under Part C—the same funds supporting traditional Medicare under Parts A and B. 42 U.S.C. § 1395w-23(f). Consequently, Congress's mandate that Medicare shall not be the entity primarily footing the bill is still a long way from being realized. Litigation, such as this, ensures that MAOs can recover from primary payers efficiently to reach the goals of the MA program.

30.     This litigation seeks to reconcile, in an accurate, structured, and equitable way, claims for reimbursement Defendants have owed for years to the MAO Assignors.

**DEFENDANTS' DUTIES TO REPORT PRIMARY PAYER OBLIGATIONS**

31.     Defendants are property and casualty insurers in the business of collecting premiums in exchange for taking on risk that they will have to pay for personal and property damage resulting from covered events.

32.     Defendants underwrite property and casualty insurance policies that include first-party and third-party medical coverage. A first-party insurance policy refers to the policy of the injured person. A third-party insurance policy refers to the property and bodily injury policy covering the person or entity who was responsible for the accident. First-party medical coverage includes Personal-Injury-Protection ("PIP") policies that are usually issued pursuant to a state no- fault statute or provide Medical Payments Coverage ("MedPay") found in a first-party policy. The first-party policy can also, and in most instances does, contain bodily injury coverage. Third-party coverage includes coverage under the uninsured motorist and/or underinsured motorist coverage provisions of a first-party insurance policy. The uninsured motorist and underinsured motorist coverage pays for medical expenses arising out of an automobile accident that was the fault of a third party where the third party has no coverage or insufficient coverage to pay the claims of the injured party.

33.     Defendants have a primary payer obligation under the MSP Act to reimburse MAOs such as Plaintiff's MAO Assignor for medical expenses arising out of an accident involving a Medicare beneficiary in three general situations involving both first-party and third- party policies:

   **(1)     Contractual**: When Defendants have a contractual obligation to pay under a first-party policy such as for PIP or MedPay;

   **(2)     Settlement**: When Defendants settled a bodily injury claim made against a third party under a third-party liability policy, such as commercial property insurance; and

   **(3)     Hybrid Situations**: Where an accident renders Defendants a primary payer under both a contractual and a settlement-based obligation.

   **A.     First-Party Policy Claims: First-Party Policy Medical Coverage**

34.     Defendants are primary payers when they issue insurance policies that provide for first-

party medical coverage that pays the reasonable and necessary medical expenses that an insured (or a passenger) incurred due to injuries sustained in an accident, regardless of fault. 42 U.S.C. § 1395y(b)(2)(A). The type of first-party medical coverage varies state by state. Some states provide for mandatory PIP coverage (for automobile accidents) while other states provide for mandatory or optional MedPay coverage. A few states have both PIP and MedPay available.

35.     In states that are considered "at-fault" states because they do not have mandatory no-fault coverage, insureds in some states have the option to purchase PIP coverage or some form of medical payments coverage (such as in Arkansas, Maryland, South Dakota, Texas, Virginia, and Washington). In all other states, they may purchase MedPay, which also pays medical benefits regardless of who was at fault in the accident.

36.     For purposes of this Third Amended Complaint, "First Party Policy Claims" will refer to those instances in which the MAO Assignors made accident-related conditional payments on behalf of a Medicare beneficiary that was also an insured under a first-party policy that provided medical payments regardless of fault such as PIP or MedPay. First Party Policy Claims include instances where such payments are made for losses arising out of automobile accidents as well as other covered losses such as slip and fall accidents.

**B.     <u>Settlement Claims: Third-Party Bodily Injury Coverage Where Defendants Settled a Liability Claim</u>**

37.     When a Medicare beneficiary is injured in an accident that is the responsibility of a third party, Defendants may be the insurer of the third party or may be responsible under the Medicare beneficiary's own policy by virtue of uninsured or underinsured motorist bodily injury policies ("UM" and "UIM" policies). Defendants have no obligation to pay benefits under the third-party policy or the UM/UIM policies unless the third party was "at fault."

38.     Third-party liability policies can include umbrella coverage, which are policies that may include coverage for medical expenses that the insured is legally obligated to pay in excess of no-

fault or medical-payments coverage, or bodily injury policy limits. Defendants also offer insurance coverage under commercial or personal policies considered as general liability or homeowner policies.

39.     Under any of these policies, if Defendants choose to pay for a Medicare beneficiary's claims, including medical expenses, arising out of the accident for which Defendants' insured was responsible, or if a judgment or arbitration award is entered in the Medicare beneficiary's favor with respect to claims covered by one of the Defendants' policies, that Defendant is the responsible primary payer under the MSP Act.

40.     For purposes of this Third Amended Complaint, "Settlement Claims" refers to those instances when the MAO Assignors made accident-related conditional payments on behalf of a Medicare beneficiary who made a claim either against a third-party liability policy or under the beneficiary's own UM/UIM coverage, and Defendants compromised that claim through a settlement, a payment arising out of a judgment or arbitration award, or otherwise made a payment that covers a beneficiary's claim for medical expenses incurred as a result of a specific incident or accident.

**C.     Defendants' Obligations Once They Become Primary Payers**

41.     For both "First Party Policy Claims" and "Settlement Claims," Defendants are charged with two duties under the MSP Act: (1) reporting the claim "after" Defendants resolve that claim by making payment to the beneficiary, the beneficiary's representative, or the beneficiary's medical provider under Section 111, and (2) reimbursing Medicare within 60 days of making that reported payment to resolve the beneficiary's claim.

42.     The primary plan "must reimburse Medicare even though it has already reimbursed the beneficiary or other party." 42 U.S.C. §§ 1395y(b)(2)(B)(ii); 42 C.F.R. § 411.24(i)(1). If Defendants fail to reimburse Medicare within 60 days, the MSP Act automatically gives rise to a right to bring an action such as this one. In conjunction with these two duties, it is also a Primary Payer's

obligation to identify its beneficiaries who are simultaneously Medicare beneficiaries in order to report and reimburse in accordance with the MSP Act.

43.     Section 111 amended the MSP Act to aid Medicare in the detection of alternative sources of insurance coverage by requiring primary plans—on their own initiative—to "determine whether a claimant (including an individual whose claim is unresolved) is entitled to benefits under the program under this subchapter on any basis"—i.e., including under Medicare Advantage—and "if the claimant is determined to be so entitled," to report the claim to the Secretary. 42 U.S.C. § 1395y(b)(8)(A)-(C).

44.     The insurer's Section 111 report must provide "notice about [its] primary payment responsibility and information about the underlying MSP situation" to the Medicare payer. 42 C.F.R. § 411.25.

45.     "The notice must describe the specific situation and the circumstances (including the particular type of insurance coverage as specified in § 411.20(a)) and, if appropriate, the time period during which the insurer is primary to Medicare." 42 C.F.R. § 411.25(a)-(c).

46.     Consequently, to submit a Section 111 report, an insurer like Defendants must obtain certain data from the individuals making first- and third-party insurance claims. The data that must be obtained and reported includes:

- Medicare Beneficiary Information:

    - Beneficiary name, address, sex, and date of birth
    - Beneficiary health insurance claim number (i.e., Medicare beneficiary identification number or "HIC number")
    - Social security number (if known)

- Medicare Claim Information:

    - Date of accident, injury, or illness
    - Provider of service
    - Amount of Medicare payment (if known)
    - Date of service
    - Date of Medicare payment (if known)

- Insurer, Employer, or Administrator Information:

    - Policyholder name and address
    - Name and address of insurer or administrator
    - Policy identification number or other identifier
    - Individual case identifiers used by third party payer (if applicable)
    - Name and phone number of insurer or administrator contact person
    - Workers' compensation agency claim number (if applicable)
    - Court case or docket numbers (if applicable)
    - Beneficiary's attorney's name, address and phone number (if known and applicable)
    - Name, address, and phone number of employer
    - Date and amount of payment (specify whether undisputed payment, settlement of disputed claim, or judgment)
    - Whether, under the plan or insurance, payment was considered to be a primary or a secondary payment
    - Payee name and address

*Medicare Program; Medicare Secondary Payment*, 59 Fed. Reg. 4285-01, 4287 (Jan. 31, 1994).

47.     Where Defendants accept coverage under a first-party insurance policy—such as for PIP or MedPay coverage—Defendants have what is called an Ongoing Responsibility for Medicals ("ORM"). ORM is an entity's "responsibility to pay, on an ongoing basis, for the injured party's (the Medicare beneficiary's) 'medicals' (medical care) associated with a claim. Typically, ORM applies to no-fault and workers' compensation claims." CMS Section 111 NGHP User Guide, Chapter III: Policy Guidance, Version 7.0, Chapter 2: Introduction and Important Terms; *see also* Chapter 6: Responsible Reporting Entities § 6.3.

48.     On the other hand, when Defendants settle an accident-related claim based on third-party liability with someone entitled to Medicare benefits, they will make a lump-sum payment called a Total Payment Obligation to the Claimant ("TPOC"). The CMS Section 111 NGHP User Guide states that a TPOC "refers to the dollar amount of a settlement, judgment, award, or other payment in addition to or apart from ORM. A TPOC generally reflects a 'one-time' or 'lump sum' settlement, judgment, award, or other payment intended to resolve or partially resolve a claim. It is the dollar amount of the total payment obligation to, or on behalf of the injured party in connection with the

14

settlement, judgment, award, or other payment." Policy Guidance, Version 7.0, Chapter 2: Introduction and Important Terms (emphasis original); *see also* Chapter 6: Responsible Reporting Entities § 6.4.

49.     Under the MSP Act, Defendants must provide their Section 111 report to CMS "after the [Medicare beneficiary's] claim is resolved [by Defendants] through a settlement, judgment, award, or other payment (regardless of whether or not there is a determination or admission of liability)." 42 U.S.C. § 1395y(b)(8)(A)(ii). In other words, once Defendants enter into a settlement with or make a payment to or on behalf of a Medicare-eligible beneficiary (and not before), they must file the mandatory Section 111 report.

50.     Therefore, when Defendants have either ORM or a TPOC relating to a claim submitted by a Medicare beneficiary, they are "Responsible Reporting Entity" ("RRE") under federal law. Thus, after they make payment to resolve the claim, they are required to submit a Section 111 report to the government.

51.     To submit these Section 111 reports, Defendants must first "query" the Medicare eligibility database to determine whether the claimant is a Medicare beneficiary. CMS's Benefits Coordination & Recovery Center ("BCRC") gives reporting entities two query methods. Because of the Defendants' collective size, they must submit requests using a "Query Input File" that will be answered in fourteen days. It is from any of these scenarios where Defendants are either a first-party insurer or a third-party insurer and Plaintiff has paid for the medical expenses that should have been paid or reimbursed that Plaintiff's claims arise. Plaintiff has in effect paid for medical expenses for the same Medicare Beneficiaries that Defendants were the primary payer for and therefore Plaintiff is entitled to its damages from Defendants' failure to abide by the laws and make proper payments or reimbursements.

**D.** **Section 111 Reporting Loopholes and Defendants' Separate Duty to Notify Secondary Payers Under 42 C.F.R. § 411.25**

52.     Unfortunately, it is extremely common for property, casualty, and liability insurers, like Defendants, to fail to report a substantial number of Medicare beneficiaries' claims—even when they know the claimant is a Medicare beneficiary. This failure to report is often related to the data fields insurers must collect before using the government's electronic system for (1) querying beneficiaries' Medicare status and (2) completing Section 111 reports.

53.     When uploading a Query Input File with the BCRC to begin the Section 111 reporting process, the primary plan's query record submitted for each claimant must contain five data elements related to the claimant: (1) Social Security Number ("SSN") or Medicare Beneficiary Identifier ("MBI"); (2) the first 6 characters of the claimant's last name; (3) the first initial of the claimant's first name; (4) the claimant's date of birth; and (5) the claimant's gender. Names must be submitted exactly as they appear on the individual's Social Security or Medicare card, including spaces, hyphens, and apostrophes.[6] This electronic query process is a necessary first step in a primary plan's Section 111 reporting.

54.     These five pieces of information are *required* to determine a claimant's entitlement to Medicare benefits in the government's system and *must* be gathered by Defendants for submission to the BCRC.[6] CMS requires all five of the data elements because "the matching process depends on the quality of the data submitted. It is difficult to get a match if the input data is incorrect or invalid."[7]

55.     For the BCRC to find a match in the Medicare database, there must be an exact match on either: (1) the Medicare ID or the full SSN, and three out of the four remaining fields; or (2) the partial SSN (last five digits) and all four remaining fields. Thus, when fewer than three out of the last

---

[6] CMS, MMSEA Section 111 Liability Insurance (including Self-Insurance), No-Fault Insurance, and Workers' Compensation, Query File, January 09, 2023, page 23.

[7] *Id*. at 26.

16

four criteria match (i.e., first initial of the first name, first six characters of the last name, date of birth, and gender), the RRE will not receive a match even if the submitted Medicare ID of that claimant is indeed a Medicare beneficiary. This is true even if the RRE has a clear reason to know—from medical bills, information received from medical providers, or based on the claimant's age—that the insurance claimant is a Medicare beneficiary.

56.     To incentivize compliance with this Section 111 reporting process, Congress "include[d] authority for CMS to impose CMPs [civil money penalties] against entities that fail to comply with the section 111 of MMSEA reporting requirements," providing for "a CMP of . . . up to $1,000 . . . for each calendar day of noncompliance." *Medicare Program; Medicare Secondary Payer and Certain Civil Money Penalties*, 88 Fed. Reg. 70363-01, 70369 (Oct. 11, 2023). However, the penalty provision has not yet gone into effect. CMS first proposed a regulation for enforcing this authority in 2013 but did not establish a final rule until October 2023, with the regulation set to become effective in October 2024. *Id*. at 70363.

57.     The final rule, effective October 2024, includes several loopholes that allow primary plans to escape civil money penalties for underreporting over the past decade. At the same time, however, "[t]hese [S]ection 111 of MMSEA reporting provisions do not eliminate any other existing statutory provisions or regulations." *Medicare Program; Medicare Secondary Payer and Certain Civil Money Penalties*, 85 Fed. Reg. 8793-02, 8794-95 (Feb. 18, 2020). "These section 111 of MMSEA reporting provisions did not alter any other existing statutory provisions or regulations." *Medicare Program*, 88 Fed. Reg. 70363-01, 70364. Therefore, even when primary plans may escape government-imposed penalties for underreporting, they still have an enforceable duty to reimburse Medicare for the unreported claims.

58.     One loophole in CMS's final rule for civil penalties is its error tolerance threshold. Primary plans may commit reporting errors on up to 20% of their reportable claims before being hit with civil money penalties. *Id*. at 70366.

59.     The final rule also states that the government will refrain from imposing civil money penalties for noncompliance over the preceding decade prior to October 2024. *Id*. at 70368 ("CMPs will only be imposed on instances of noncompliance based on those settlement dates, coverage effective dates, or other operative dates that occur after the effective date of this regulation[.]").

60.     Even with these substantial safe harbors, property and casualty insurers pressed hard for another exception to civil money penalties. To that end, industry associations representing the majority of non-group health plans ("NGHPs"), such as no-fault and liability insurers, sent a deluge of comments to CMS. In contrast with group health plans ("GHPs"), the no-fault and liability insurers commented that (1) they are routinely unable to report to CMS because Medicare beneficiaries refuse to share their SSNs or MBIs, and (2) the primary plans are very reluctant to insist that claimants provide this information:

> Comment: Commenters suggested that CMS refrain from imposing CMPs where NGHPs [non-group health plans] with reporting obligations under section 1862(b)(8) of the Act make 'good faith efforts' to obtain required information from individuals who are unwilling or unable to provide it. Some 'good faith efforts' suggested included the following: (1) CMS could accept documentation signed by the individual stating that he or she is either not a Medicare beneficiary, or will not provide the NGHP entity with his or her Social Security Number (SSN) (full SSN or last 5 digits); and (2) CMS could accept a judicial order establishing that the individual is not required to provide his or her Medicare Beneficiary Identifier (MBI) or SSN to the NGHP entity."

> Response: We note that concerns about 'good faith efforts' were received from the NGHP [non-group health plan] industry and not the GHP [group health plan] industry during both rounds of comments, which we believe is reflective of the fundamental differences between the two industries and the relationships between those plans and the individuals in question.

> Our understanding is that NGHP applicable plans may at times be in an adversarial relationship with the reportable individual, whereas the reportable individual is typically the client of a GHP.

> To this end we understand the concern regarding privacy law or consumer protection

statute violations, as were mentioned by some commenters. In response to these comments, we stress that CMPs will not be imposed against NGHP entities where those entities have made good faith efforts, as outlined in this final rule, to obtain necessary reporting information.

*Medicare Program*, 88 Fed. Reg. 70363-01, 70368.

61.     CMS's conclusion—that NGHPs often fail to obtain the information required to complete reports—is supported by the comments of several industry associations. The comments came from (1) insurance associations whose members include a majority of property, casualty, and liability insurers nationwide; (2) one of the most influential associations of corporate defense law firms; and (3) the United States' largest third-party administrator for Section 111 reporting, hired by insurance companies to report on their behalf.

62.     For example, the American Property Casualty Insurers Association ("APCIA") is a group whose "members write approximately 70% of the workers' compensation, liability and no-fault insurance in the U.S.."[8] APCIA objected to CMS's proposed requirement that primary plans make at least two attempts to obtain the SSNs or MBIs required for Section 111 reporting. APCIA asserted that more than one attempt would leave claimants "frustrated and angry," and added that "many insurers" are "consciously reducing the number of" their "contacts with claimants":

> Consumers are understandably sensitive about supplying their health and other private information to commercial entities – particularly those, like property-casualty insurers in many instances, with whom they are not in privity of contract. As a result, they will become frustrated and angry when repeatedly asked for the same information if they have already refused to provide it. This could, and indeed already does, trigger consumer complaints against property casualty insurers for violations of privacy and insurance laws and other consumer protection statutes.
>
> Many insurers are consciously reducing the number of such contacts with claimants in order to comply with these requirements, and any contrary mandates will frustrate these efforts and unduly interfere with the state-based nature of insurance regulation.[9]

---

[8] https://www.regulations.gov/comment/CMS-2013-0266-0074 (comment downloaded Jan. 26, 2024), at 1.

[9] *Id*. at page 5.

63.    Because APCIA's members include the outright majority of property and casualty insurers nationwide, these comments fairly reflect the views of the industry as a whole.

64.    Another industry organization, the Property Casualty Insurers Association, described itself as "a national trade association of over 1000 property casualty insurers," which "write 45.7 percent of automobile insurance" and "32.9 percent of liability insurance written by private insurers."[10] The Property Casualty Insurers Association complained that its members "continue to struggle" to obtain the SSNs or MBIs needed to report a significant number of Medicare beneficiaries' claims to the government, "especially when a liability claim is involved":

> RREs [responsible reporting entities] continue to struggle with obtaining Health Insurance Claims Numbers (HICNs) or Social Security Numbers (SSNs), especially when a liability claim is involved. This includes refusals by the claimant to state whether he/she is or is not a Medicare beneficiary.[11]

65.    As its members include nearly one third of the U.S. market for liability insurance, the Property Casualty Insurers Association's comment reflects the experience of the industry as a whole.

66.    A similar assertion was made by Sedgwick, the largest third-party Section 111 reporting administrator in the nation. In its own words,

> Sedgwick reports to The Centers for Medicare & Medicaid Services (CMS) on behalf of more than 1,750 Responsible Reporting Entitles (RRE) including insurance carriers and self-insured companies. In 2019, Sedgwick reported to CMS in excess of:  • 102,500 worker's compensation cases; • 13,300 liability cases (general, auto and professional liability); and • 1.6 million queries on all claims to determine Medicare beneficiary status."[12]

Like the insurance industry groups, Sedgwick pressed CMS to reduce the efforts required by primary plans to obtain SSNs or MBIs from claimants who are Medicare enrollees, claiming these efforts will

---

[10] https://www.regulations.gov/comment/CMS-2013-0266-0020 (comment downloaded Jan. 26, 2024), page 1.

[11] *Id*. at page 3.

[12] https://www.regulations.gov/comment/CMS-2013-0266-0045 (comment downloaded Jan. 26, 2024), page 1.

leave claimants "angry and frustrated":

> The Proposed Rule includes an exemption for those situations where a beneficiary refuses to provide needed information to an RRE for reporting. Sedgwick appreciates and supports this proposal but recommends that the Agency not be proscriptive in the number of 'touches' that a reporting entity must make (and how they must be made). Claimants and injured workers are sensitive to supplying private and health information to an RRE, and they can become angry and frustrated when repeatedly asked for the same information after they have made clear that they will not provide it.[13]

67.     A similar comment was made by the Risk Insurance Management Society, which is "the largest not-for-profit organization dedicated to advancing the theory and practice of risk management with over 11,000 members worldwide from more than 3,500 entities."[14] Like the other industry groups, "[t]he main concern expressed by [RIMS'] membership is that they be held in noncompliance when failure to report is due to an inability to obtain Social Security numbers or Health Insurance Claims numbers from beneficiaries and other claimants."[15] Because this category of under-reporting was the "main concern" of RIMS's members, RIMS pushed for "a safe harbor for entities that make a good faith effort to obtain this, and any other necessary information, but are simply unable to do so."[16]

68.     This same argument was made even more explicit by "DRI – The Voice of The Defense Bar," an organization of more than 22,000 corporate defense lawyers that acts as a thought leader for the defense bar. That organization submitted a comment to CMS through DRI's "Medicare Secondary Payer ('MSP') Task Force." DRI's comment explicitly recognized that primary plans *may actually know claimants are Medicare beneficiaries*, yet still fail to make Section 111 reports:

> The NGHP Model Language form currently requires a signature from the individual that refuses to provide the information necessary to submit the 'Query.' In some

---

[13] *Id*. at page 5.

[14] https://www.regulations.gov/comment/CMS-2013-0266-0017 (comment downloaded Jan. 26, 2024), at page 1.

[15] *Id*. at page 2.

[16] *Id*.

21

instances, however, the individual at issue may not only refuse to provide the information necessary to query, but also refuse to sign the NGHP Model Language form. In these instances, 'good faith efforts' should be demonstrated by . . . documentation that the RRE made reasonable attempts to get the individual at issue to sign or complete the Model Language form.

Further, such actions should constitute 'good faith efforts' *even where an RRE knows that an individual is a Medicare beneficiary*.

The Model Language Form currently excludes from the safe harbor circumstance where the RRE knows that the individual at issue is a Medicare beneficiary. This exclusion should be modified such that it only excludes RREs that know the data points that would permit it to submit the Query. *This clarification would address circumstances where the RRE may know or have reason to believe the individual is a Medicare beneficiary, but not have access to the data points to permit it to submit a Query*."

(Emphasis added).[17]

69.    DRI's comment tacitly admits the very common situation in which a primary plan "may know or have reason to believe the individual is a Medicare beneficiary" yet cannot make a Section 111 report because it has failed to collect "the data points to permit it to submit a Query" through CMS's system. Even if a primary plan does not obtain a claimant's SSN or MBI, a medical provider may send a bill to the primary plan, identifying the Medicare secondary payer by name. Alternatively, if a primary plan knows the claimant is over the age of 65, the primary plan is on notice that it should ask the medical provider if it has billed any other payers, such as an MAO. These situations are extremely common.

70.    Furthermore, primary plans commonly have internal policies, procedures, and training manuals that recognize their ability to verify Medicare beneficiary status by simply asking the medical provider.  It is highly likely that Defendants are no different from other insurers in this regard, because this is an industry-wide phenomenon.

71.    Based on these ubiquitous facts about the industry as a whole, Plaintiff alleges that

---

[17] https://www.regulations.gov/comment/CMS-2013-0266-0021 (comment last downloaded Jan. 26, 2024), pages 7-8.

Defendants are no different from other property and casualty insurers. That is, Defendants regularly receive claims from Medicare beneficiaries that they do not report to the government because they have failed to obtain the beneficiaries' SSNs and MBIs. Plaintiff further alleges that for many of these unreported claims, Defendants are on notice the claims involve Medicare beneficiaries because, among other things, the claimants are over the age of 65.

72.     In addition to these comments from insurers, one court decision illustrates how common it is for an insurer to fail to collect the SSN or MBI needed to report a claim under Section 111. This decision occurred in a case in which a primary plan was ordered to exchange a random sample of claims data with an MAO's assignee to identify instances of overlapping coverage. That court found that on 38% of the occasions in which both the primary plan and an MAO provided coverage for an incident, the primary plan did not make a Section 111 report because it had not acquired the necessary data fields (such as the claimant's SSN or MBI):

> 2,659 claim numbers did not have the fields necessary to query CMS or to comply with applicable reporting requirements. These claims could not have been reported by IDS with the information presented in the Defendant's production. This means that Defendant did not have sufficient information to comply with its reporting requirements in 38% of instances.

**Exhibit A**, Order Granting Motion for Order to Show Cause, at 11, *MSPA Claims 1, LLC v. IDS Prop. Cas. Ins. Co.*, 2015-027940-CA-01 (Fla. 11th Jud. Cir. Ct. Aug. 8th, 2021).

73.     There is no reason to believe this 38% figure is far from the number of claims Defendants fail to report—even when the claimant is enrolled in Medicare— because they have not collected the claimant's SSN or MBI. Again, according to associations representing property and casualty insurers' interests, such insurers "struggle" to obtain the SSNs and MBIs needed to complete Section 111 reports—even when they know the claimant is a Medicare beneficiary. That is why these organizations persuaded CMS to refrain from imposing civil money penalties for these very common reporting failures.

74.     Additionally, for claims arising prior to October 2024, when the new regulation governing civil penalties becomes effective, primary plans can avoid penalties without showing they ever made a good-faith effort to obtain SSNs or MBIs from beneficiaries in the past. *Medicare Program*, 88 Fed. Reg. 70363-01, 70368.

75.     At the same time, "[t]hese [S]ection 111 of MMSEA reporting provisions do not eliminate any other existing statutory provisions or regulations," *Medicare Program;* 85 Fed. Reg. at 8794-95, nor do they "alter any other existing statutory provisions or regulations." *Medicare Program*, 88 Fed. Reg. at 70364.  Because all other statutory and regulatory duties remain intact and unaltered, the mere fact that an insurer can avoid a fine for under-reporting does not relieve it of its duty to comply with "other regulations."

76.     One of those "other regulations" provides that if a primary plan is on notice that Medicare may have paid for a claimant's treatment when the primary plan is responsible, the primary plan must notify Medicare of the "specific situation and the circumstances" surrounding that claim. 42 C.F.R. § 411.25. "Section 411.25(a) requires a primary payer to provide information about primary payment responsibility and the information about Medicare Secondary Payer situation to the entity or entities designated by CMS to receive the information." *Medicare Program; Medicare Secondary Payer (MSP) Amendments*, 73 Fed. Reg. 9679-01, 9683 (Feb 22, 2008). This duty applies regardless of whether the primary plan has collected the claimant's SSN or MBI, because such items are often not required to know as a practical matter that a claimant is a Medicare beneficiary.

77.     This duty to notify applies equally when the claimant's Medicare benefits are provided by an MAO. *See* 42 C.F.R. 422.108(f) (giving MAOs the same rights as CMS under the regulations within Chapter 411 of the Code of Federal Regulations).

**DEFENDANTS' FAILURE TO COMPLY WITH THE MSP ACT**

78.     For numerous years, and continuing through the present, Defendants have failed to

comply with their duty to gather the necessary information from the claimants to enable them to submit all the required data elements to CMS so that CMS can identify for Defendants those claimants entitled to Medicare benefits. This habitual failure frequently results in Defendants making no Section 111 submission at all. When Defendants fail to make a Section 111 report, Medicare and MAOs do not have the requisite information needed to identify a primary payer and to seek reimbursement for conditional payments.

79.     Upon information and belief, Defendants track their compliance with Section 111 through periodic audits conducted to evaluate their success at collecting and submitting complete data sets for claimants.

80.     Upon information and belief, the audit reports show Defendants fail to consistently comply with Section 111. Upon further information and belief, those reports are shared with Defendants' upper management and establish Defendants' knowledge that it does not fully comply with their duties to identify Medicare beneficiaries and, as a result, fail to reimburse claims conditionally paid by Medicare or MAOs.

81.     Defendants' failure to obtain the necessary data points to determine a claimant's Medicare eligibility, whether intentional or unintentional, results in significant under-reporting and, correspondingly, the inability of Medicare or MAOs to uncover all the instances in which Defendants owe reimbursement of conditional payments. Defendants are aware of their obligation under the MSP Act to "determine whether a claimant (including an individual whose claim is unresolved) is entitled to benefits under the program under this subchapter on any basis," 42 U.S.C. § 1395y(b)(8), and have access to the necessary data to make this determination. In fact, in most instances, Defendants have the requisite data points in its system to make this determination and report their primary payer status pursuant to Section 111 and, to the degree they do not, are aware of their affirmative statutory duty to obtain that information.

25

82.     Upon information and belief, Defendants fail to properly report hundreds of reimbursable claims nationwide. Plaintiff compared the claims data it received from its MAO Assignors to publicly available motor vehicle accident reports to identify instances where Medicare beneficiaries appear to have been involved in crashes. Plaintiff then took that pool of beneficiaries and compared them to Section 111 reports made by Defendants. Upon completion of that comparison, there are numerous instances where, upon information and belief, it appears Defendants either completely failed to report reimbursable claims or withdrew a prematurely filed report.

83.     Even though Defendants, as primary payers, bear the responsibility for coordinating benefits and identifying whether Medicare or any MAO is entitled to reimbursement of conditional payments, Plaintiff attempted, prior to bringing this lawsuit, to work with Defendants to identify conditional payments made by Plaintiff's MAO Assignors that Defendants should have reimbursed. Plaintiff, through its data servicer, sent out hundreds of coordination of benefits letters to Defendants and devoted a tremendous amount of resources to try to work with Defendants to resolve each letter. The letters related to both First Party Policy Claims and Settlement Claims.

84.     In the absence of discovery that would be allowed in litigation, Plaintiff—like Plaintiff's MAO Assignors—have access to only two sets of publicly available data to identify when Plaintiff's MAO Assignors may have paid for medical expenses that were actually the responsibility of Defendants as primary payers: (1) Section 111 reporting and (2) official accident reports when they are available. These sources cannot, however, identify instances of unreported claims, and official accident reports are not publicly available in most states, although they are available in Florida. Using Plaintiff's two sole sources of available information, Plaintiff identified Defendants as the primary payers for the conditional payments reflected in the coordination of benefits letters because the Defendants reported that they either settled with or insured the exact Medicare Beneficiary that Plaintiff's MAO Assignors made payments on behalf of that should have been paid or reimbursed by

the primary payer. Factually, Plaintiff's MAO Assignors have paid for the medical expenses of Medicare beneficiaries, and Defendants only need to confirm or deny that they insure or otherwise settled claims with the same exact beneficiaries that Plaintiff's MAO Assignors insure and have paid for pursuant to their agreement to provide Part C Coverage.

85.     Plaintiff accesses the Section 111 reports through a CMS-authorized vendor called MyAbility. MyAbility's data is drawn directly from data that Defendants submitted to CMS either itself or through a reporting vendor. Accordingly, any inaccuracy or lack of specificity in the Section 111 data is attributable solely to Defendants.

86.     Once Defendants notify CMS under Section 111 that they are primarily responsible for paying medical claims, Plaintiff, through its data servicer, examines the health care claims data of its assignor for codes CMS recognizes for identification of medical procedures and diagnoses (CPT and ICD codes) associated with a car accident or incident within 0-30 days of the reported date of loss and is able to establish medical claims its MAO Assignors have paid for that Defendants should have paid or reimbursed. While there are additional claims that are incurred after the first 30-day period, for purposes of placing the Defendants on notice, Plaintiff reduced the size of the universe for pleading purposes only. However, Plaintiff has more claims at issue in this case that it will raise as part of this lawsuit.

87.     Subsequently, Plaintiff's data servicer sends a Demand Letter to Defendants.

88.     Then, on some occasions, Defendants send a response letter. To date, Plaintiff's data servicer has sent **333** Demand Letters to Defendants, with responses received in **209** cases.

89.     Additionally, Plaintiff's data servicer sent **6** Crash Report notifications to Defendants, derived from publicly available Florida official accident reports identifying Defendants as the insurer for the owner and driver of the vehicle who was simultaneously covered by a Medicare Advantage Plan issued by Plaintiff's assignors. In many of these instances, Defendants neglected to

report these accidents to CMS in accordance with Section 111.

90.     Defendants sent 7 inadequate responses to the crash report notifications.

91.     Defendants' response letters tend to have one of two responses: refusal to provide any information that would allow the parties to coordinate benefits as the law requires, or denial of any responsibility based on purported legal defenses that have no basis in law or fact.

92.     For the First Party Policy Claims, Plaintiff attempted to coordinate benefits for 289 instances in which Defendants reported under Section 111 having made a payment based on the existence of a first-party insurance policy for a Medicare beneficiary enrolled with one of Plaintiff's MAO assignors. Those claims corresponded with payments made by Plaintiff's assignors on behalf of Medicare beneficiaries that resided in 13 different states.

93.     For the Settlement Claims, Plaintiff attempted to coordinate benefits for 44 instances in which Defendants acknowledged in a Section 111 filing that they had entered into a settlement with a Medicare beneficiary enrolled with the MAO Assignor under a third-party insurance policy or UM/UIM. Those claims corresponded with payments made by Plaintiff's MAO Assignors on behalf of Medicare beneficiaries that resided in 9 different states.

94.     Plaintiff devoted significant resources in its attempt to coordinate benefits with Defendants and to avoid litigation. Plaintiff has no choice but to bring this action because its comprehensive and exhaustive efforts to coordinate and work with Defendants outside of litigation have been unsuccessful. In fact, in their responses to Plaintiff's correspondence, Defendants have habitually stonewalled Plaintiff's effort to coordinate benefits by raising improper defenses to properly compensable claims (such as exhaustion of policy limits when the conditional payments predated the exhaustion) or simply dodging any substantive response (such as failing to provide Defendants' own claim or policy number). In doing so, Defendants purposely hide information about their primary payer responsibilities in an effort to avoid payment and to allow time to pass so that the

statute of limitations expires, and no claim can be presented. In effect, Defendants cheat the Medicare Trust Fund by purposely hiding their primary payer obligations and fail to comply with the law.

95.    In addition to declining to coordinate with respect to potential claims identified through Section 111 reporting and official accident reports, Defendants have also refused to share any data with Plaintiff for the purpose of identifying situations where Defendants were a primary payer but did not submit a Section 111 report—a process that numerous other carriers have agreed to explore outside of litigation. Defendants' actions in refusing to coordinate benefits are purposeful and designed to continue to conceal details of its primary payer responsibility when it has failed to submit a Section 111 report.

96.    Because of Defendants' resistance to voluntarily coordinating benefits with Plaintiff, Plaintiff is forced to seek through this action to identify all instances in which Defendants had a primary payer responsibility to reimburse accident-related conditional payments made by the Plaintiff's MAO Assignors. Defendants have not pointed to any other means by which Plaintiff or Plaintiff's assignors could identify and pursue recovery for instances in which Defendants are the primary payer for conditional payments made by Plaintiff's MAO Assignors. Plaintiff and its lawyers, by agreement or court order, have already performed data matching efforts that have revealed that most insurance companies do not report a significant amount of the claims that are required to be reported.

97.    At this point, after Plaintiff has attempted to use both publicly available sources to recover conditional payments made by Plaintiff's MAO Assignors without success, the most efficient and fair way to quantify those damages is through a process that resembles what several other carriers are already doing voluntarily. To identify undetected claims for primary payers *other than* Defendants, Plaintiff has engaged in data sharing exercises with those primary payers, who are also property and casualty insurers, in which the parties match data to identify all the instances in which a

29

MAO made payments that overlap with a first- or third-party claim made to the insurer by a Medicare beneficiary enrolled with the MAO. This process uses matching techniques that compensate for missing data and data imperfections and is consistent with Congress's intention in enacting the MSP Act to ensure that Medicare and, ultimately, MAOs (Part C plans) are repaid in *all instances* where an insurer is primary.[18]

98.      Without enforcement through litigation of Defendants' statutory obligations to cooperate with Plaintiff's requests for information regarding conditional payments made by Plaintiff's MAO Assignors, Defendants can continue to systematically fail to report its responsibility and, thereby, avoid its primary payer obligations.

## STANDING ALLEGATIONS

### A.      Assignment Allegations

---

[18] *E.g.,* **(1) Allstate Insurance Company** (*MSPA Claims 1, LLC v. Allstate Ins. Co.*, Case No. 1:17-cv-01340, D.E. 169 (N.D. Ill. Mar. 8, 2022)) (no-fault settlement exploration through data sharing; *MSP Recovery Claims 1, LLC v. Allstate Ins. Co.*, Case No. 20-cv-24140 at Dkt. No. 70 (S.D. Fla. 2020)) (bodily injury settlement exploration through data sharing), **(2) Auto-Owners Insurance Company** (*MSP Recovery Claims, Series LLC v. Auto-Owners Ins. Co.*, Case No. 17-cv-23841 at Dkt. No. 143 (S.D. Fla. 2022)) (settlement exploration through data sharing and noting in the joint report requesting dismissal that "[t]he parties believe that the best opportunity to finally resolve their disputes will be to continue engaging in a data matching process agreed to by the parties" and "this exercise is a reconciliation that will be handled by the parties outside of litigation"); **(3) National General Insurance Company** (*MSP Recovery Claims, Series LLC, et al. v. Integon Nat. Ins. Co., et al.*, Case No. 20-cv-24051, D.E. 147 (S.D. Fla. 2022)) (settlement exploration through data sharing), **(4) Sentry Insurance Company** *MSP Recovery Claims, Series LLC v. Dairyland Ins. Co.*, Case No. 17-cv-23983 at Dkt. No. 91 (S.D. Fla. 2020)) (no-fault and bodily injury settlement exploration through data sharing); **(5) Grange Insurance Company** (*MSP Recovery Claims, Series LLC v. Grange Ins. Co.*, Case No. 19-cv-219 at Dkt. No. 36 (N.D. Ohio 2019)) (noting in joint report that Grange agreed to "engage in a defined claims data matching process" to explore settlement, which resulted in a global settlement); **(6) Esurance Insurance Services, Inc** (*MSP Recovery Claims Series, LLC v. Esurance Property and Casualty Co.*, Case No. 20-cv-23590 at Dkt. No. 50 (S.D. Fla. 2020)) (no-fault and bodily injury settlement exploration through data sharing); **(7) Amica Mutual Insurance Company** (*MSP Recovery Claims, Series LLC v. Amica Mut. Ins. Co.*, Case No. 20-cv-24050, D.E. 42 (S.D. Fla. May 6, 2022)) (settlement exploration through data sharing); **(8) Horace Mann Insurance Company** *MSP Recovery Claims, Series LLC v. Horace Mann Ins. Co.*, Case No. 20-cv-24419, Dkt. No. 40 (S.D. Fla. July 9, 2021)) (global settlement reached based on data sharing); **(9) 1199 SEIU National Benefit and Pension Funds** (*MSP Recovery, LLC v. 1199 SEIU Nat'l Benefit and Pension Funds*, Case No. 20-cv-1480) (global settlement reached following data sharing).

**Assignment of AvMed's Claims to Series 17-03-615**

99.     MSPRC's claims in this lawsuit stem from its assignment agreement with AvMed, Inc. ("AvMed"), an MAO. On June 26, 2019, AvMed entered into a Claims Purchase Agreement & Assignment with Series 17-03-615, a Designated Series of MSPRC, whereby it irrevocably assigned all rights to recover payments made on behalf of its beneficiaries (the "AvMed Assignment"). The AvMed Assignment expressly provides, in pertinent part:

> Assignor irrevocably assigns, transfers, conveys, sets over and delivers to MSP Recovery, and any of its designated series, successors and assigns, any and all of Assignor's right, title, ownership and interest in and to (i) all Claims existing on the date hereof, whether based in contract, tort or statutory right, and all related recovery rights arising from and related to the claims data transferred to MSP Recovery (or its affiliates or service providers, including [MSP Recovery]), and (ii) any and all causes of action, claims and demands of any nature whatsoever relating to payments for health care services provided to Assignor's members and enrollees, and legal or equitable rights (including, but not limited to, subrogation) to pursue and/or recover monies related to the Claims that Assignor had, may have had, or has asserted against any party in connection with the Claims; and (iii) all causes of action, claims, rights and demands of any nature whatsoever, legal or equitable, against primary payers, Responsible Parties and/or third parties that may be liable to Assignor arising from or relating to the Claims, including claims under consumer protection statutes and laws (all of the items set forth in (i)-(iii), the "Assigned Claims") . . . . The assignment of the Assigned Claims set forth herein is irrevocable and absolute.

AvMed Assignment, ¶ 1.1.1.

100.    Following this initial assignment, AvMed entered an additional assignment agreement with Series 17-03-615, effective December 31, 2020 ("AvMed Assignment II"). The AvMed Assignment II provided that AvMed "wishes to sell and assign, and [Series 17-03-615] wishes to purchase, additional Claims arising from and evidenced in Claims Data transferred to MSP Recovery, LLC, commencing with the third calendar quarter of 2019 (plus the additional four days of data after the effective date of the Purchase Agreement, i.e., encompassing dates of service from June 27, 2019 through September 30, 2019) through July 31, 2020." It defined the claims assigned as "Quarterly Claims," which had been delivered to MSPRC through "Quarterly Claims Data." It further

provided that AvMed "irrevocably assigns, transfers, conveys, sets over, and delivers to [Series 17-03-615] . . . any and all of [AvMed's] right, title, ownership, and interest in and to" the Quarterly Claims.  The "Assigned Claims" exclude claims against "[AvMed's] network healthcare providers and current and former members" as well as "[c]laims arising from and related to the GlaxoSmithKline[] manufacturing facility in Cidra, Puerto Rico[.]" Defendants are not AvMed "network healthcare providers" or "current [or] former members" and the claims at issue in this action do not relate to "GlaxoSmithKline's manufacturing facility in Cidra, Puerto Rico." Before filing this lawsuit, MSPRC verified, through discussion with AvMed and/or a review of AvMed's records, that all claims identified in this lawsuit were not subject to any exclusion or carveout. As such, no claims brought in this Complaint are subject to any carveouts and no claims are being pursued by another assignee, third-parties, or recovery vendor acting upon AvMed's behalf.

101.    The AvMed Assignments provided for a due diligence period wherein the parties would exchange deliverables and contemplated that the parties would enter into a separate "Stand-Alone Assignment Agreement" further evidencing the assignment. Upon completion of the prescribed due diligence period, and satisfaction of all conditions precedent, the parties finalized the transaction, including the exchange of compensation and execution of the Stand-Alone Assignment Agreement.

102.    Consideration was given between the parties in executing these agreements.

103.    This Complaint seeks recovery only for claims AvMed assigned to MSPRC through its Designated Series (Series 17-03-615). All claims at issue in this Third Amended Complaint, and all claims data currently in MSPRC's possession, were assigned to MSPRC, either through the original AvMed Assignment or the AvMed Assignment II. Indeed, MSPRC is only in possession of the claims data for each beneficiary identified in this lawsuit because AvMed provided that data to MSPRC as part of the aforementioned assignments.

32

104.    MSPRC sets forth the representative beneficiaries below to illustrate Defendants' failure to fulfill their statutory duties to reimburse MAOs for conditional payments. This failure to reimburse includes: (i) instances where Defendants act as a direct "no-fault" or liability insurers; and (ii) when Defendants enter into settlements on behalf of tortfeasors who are sued by Medicare beneficiaries. In these instances, Defendants reported to CMS, admitting Defendants' primary payer status and responsibility for the accident-related expenses for medical items and/or services provided to beneficiaries for which AvMed made conditional payments.

105.    The assigned "Claims" exclude claims where AvMed, Inc. already recovered on the claim or is currently pursuing the claim.

106.    AvMed, Inc. transferred data files to MSPRC identifying those claims where it already had recovered money and those claims where it is still pursuing recoveries. MSPRC reviewed that list prior to filing this case and conferred with AvMed, in an abundance of caution, to confirm that AvMed (1) never recovered money for the non-reimbursement examples set forth below and (2) is not pursuing recoveries for the non-reimbursement examples below. Accordingly, these examples of non-reimbursement remain unpursued and unreimbursed, they are not excluded from the assignment, and MSPRC has the legal right to pursue these claims.

107.    Before filing this lawsuit, MSPRC verified, through discussion with AvMed and/or a review of AvMed's records, that the claims at issue do not include any that AvMed has retained or assigned to any other vendor, and that only MSPRC alone had been assigned these claims. In this manner, MSPRC confirmed that the claims at issue are not subject to any carveout in any assignment agreement. As such, no claims brought in this Complaint are subject to any carveouts and no claims are being pursued by another assignee, third-parties, or recovery vendor acting upon AvMed's behalf.

108.    This Complaint seeks recovery only for claims AvMed assigned to Series 17-03-615. All AvMed claims at issue in this Complaint, and all AvMed claims data currently in MSPRC's

possession, were assigned to MSPRC through the AvMed Assignments. Indeed, MSPRC has possession of the claims data for each example of non-reimbursement identified in this Complaint solely because AvMed provided that data to MSPRC pursuant to the AvMed Assignments.

**Assignment of ConnectiCare's Claims to Series 15-09-157**

109.   MSPRC's claims in this lawsuit stem from its assignment agreement with ConnectiCare, an MAO. On March 20, 2018, ConnectiCare irrevocably assigned all its rights and claims to recover against any liable entity (including Defendants) for payments made on behalf of its Enrollees pursuant to Medicare law to Series 15-09-157, a designated series of Plaintiff MSP Recovery Claims, Series LLC and to MSP Recovery, LLC, a Florida Limited Liability Company. Specifically, the ConnectiCare Assignment states the following:

> Assignor hereby irrevocably assigns, transfers, conveys, sets over and delivers to Assignee, and any of its successors and assigns, any and all of Assignor's right, title, ownership and interest in and to all [claims against third parties], whether based in contract, tort, statutory right, and any and all rights (including, but not limited to, subrogation) to pursue and/or recover monies that Assignor had, may have had, or has asserted against any party in connection with the [claims] and all rights and claims against primary payers and/or . . . third parties that may be liable to Assignor arising from or relating to the [claims], including claims under consumer protection statutes and laws, and all information relating thereto, as may be applicable.

> The transfer, grant, right, or assignment of any and all of Assignor's right, title, ownership, interest and entitlements in and to the Assigned Medicare Recovery Claims shall remain the confidential and exclusive property of Assignee or its assigns. This assignment is irrevocable and absolute.

ConnectiCare Assignment, at 2.

110.   On April 4, 2018, MSP Recovery, LLC assigned the rights it acquired in the ConnectiCare Assignment to Series 15-09-157, a designated series of MSP Recovery Claims, Series LLC ("Series Assignment"). The Series Assignment from MSP Recovery, LLC to Series 15-09-157, which was ratified and approved by ConnectiCare, Inc., states:

> MSP Recovery, LLC ("Assignor"), for and in consideration of the sum of . . . and other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, hereby irrevocably assigns, sells, transfers, conveys, sets over and

delivers to **Series 15-09-157, a designated series of MSP Recovery Claims, Series LLC** . . . ("Assignee"), and its successors and assigns, any and all of Assignor's right, title, ownership and interest in and to all assigned Subject Medicare Recovery Claims, . . . as such terms may be defined in the March 20, 2018 Assignment Agreement[.]

111.    Consideration was given between the parties in executing these agreements.

112.    On March 20, 2018, ConnectiCare irrevocably assigned all rights to recover against any liable entity (including Defendants) for payments made on behalf of its Enrollees pursuant to Medicare law to Series 16-08-483, a designated series of Plaintiff MSP Recovery Claims, Series LLC and to MSP Recovery, LLC ("ConnectiCare Assignment"). The ConnectiCare assignment expressly provides, in pertinent part:

> Assignor hereby irrevocably assigns, transfers, conveys, sets over and delivers to Assignee, and any of its successors and assigns, any and all of Assignor's right, title, ownership and interest in and to all Assigned Medicare Recovery Claims, whether based in contract, tort, statutory right, and any and all rights (including, but not limited to, subrogation) to pursue and/or recover monies that Assignor had, may have had, or has asserted against any party in connection with the Assigned Medicare Recovery Claims and all rights and claims against primary payers and/or, subject to the definition of Assigned Medicare Recovery Claims, third parties that may be liable to Assignor arising from or relating to the Assigned Medicare Recovery Claims, including claims under consumer protection statutes and laws, and all information relating thereto, as may be applicable . . . .
>
> The transfer, grant, right, or assignment of any and all of Assignor's right, title, ownership, interest and entitlements in and to the Assigned Medicare Recovery Claims shall remain the confidential and exclusive property of Assignee or its assigns. This assignment is irrevocable and absolute.

ConnectiCare Recovery Agreement, at 2.

113.    The "Medicare Recovery Claims" assigned to Plaintiff MSP Recovery Claims, Series LLC include ConnectiCare's "legal and equitable rights to seek reimbursement and/or recover payments from primary payers . . . responsible to [ConnectiCare] directly or through rights conferred on [ConnectiCare] pursuant to state and/or federal law pertaining to beneficiaries, for Health Care Services provided to [ConnectiCare's] Medicare (as defined above) enrollees arising under state

and/or federal laws, including common law subrogation theories, that provide for the reimbursement of payments made by [ConnectiCare] . . . pursuant to a Medicare Advantage Plan[.]" *Id.* at 1.

114.    The "Assigned Medicare Recovery Claims" included the above-referenced Medicare Recovery Claims but excluded "Medicare Recovery Claims that [could] be asserted against Assignor's members, enrollees and/or contracted providers" and Medicare Recovery Claims that as of March 20, 2018 (the Effective Date of the agreement) had been assigned to and/or were being pursued "by other recovery vendors" for services rendered within a defined six-year time period. *Id*. These excluded claims are defined in the ConnectiCare Assignment as "Assignor Retained Claims." *Id*. The claims at issue in this lawsuit do not include any "that as of March 20, 2018 . . . had been assigned to and/or were being pursued" by "other recovery vendors."

115.    On April 4, 2018, MSP Recovery, LLC assigned the rights it had acquired in the ConnectiCare Assignment to Series 16-08-483, a designated series of Plaintiff MSP Recovery Claims, Series LLC ("Series Assignment"). The Series Assignment from MSP Recovery, LLC to Series 16-08-483, which was ratified and approved by ConnectiCare, states:

> MSP Recovery, LLC ("Assignor"), for and in consideration of the sum of … and other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, hereby irrevocably assigns, sells, transfers, conveys, sets over and delivers to Assignee, **Series 16-08-483, a designated series of MSP Recovery Claims, Series LLC,** a Delaware Series Limited Liability Company, and its successors and assigns, any and all of Assignor's right, title, ownership and interest in and to the "Assigned Claims", "Claims", "Assigned Assets" "Assigned Medicare Recovery Claims" and "Assigned Documents" (and all proceeds and products thereof) as such terms may be defined in the March 20, 2018 Assignment Agreement[.]

Series Assignment, at 1 (emphasis in original). Consideration was given between the parties in executing this assignment.

116.    This Complaint seeks recovery only for claims ConnectiCare assigned to Series 15-09-157. All ConnectiCare claims at issue in this Complaint, and all Connecticare claims data currently in MSPRC's possession, were assigned to MSPRC through the ConnectiCare Assignment. Indeed,

MSPRC has possession of the claims data for each example of non-reimbursement identified in this Complaint solely because ConnectiCare provided that data to MSPRC pursuant to the ConnectiCare Assignment.

117. Before filing this lawsuit, MSPRC verified, through discussion with ConnectiCare and/or a review of ConnectiCare's records, that the claims at issue do not include any that ConnectiCare has retained or assigned to any other vendor, and that only MSPRC alone had been assigned these claims. In this manner, MSPRC confirmed that the claims at issue are not subject to any carveout in any assignment agreement. As such, no claims brought in this Complaint are subject to any carveouts and no claims are being pursued by another assignee, third-parties, or recovery vendor acting upon ConnectiCare's behalf.

**Assignment of Emblem's ("HIPGNY") Claims to Series 16-08-1483**

118. MSPRC's claims in this lawsuit stem from its assignment agreement with Health Insurance Plan of Greater New York, an Emblem company that is an MAO.

119. On March 20, 2018, Emblem irrevocably assigned all rights to recover against any liable entity (including Defendants) for payments made on behalf of its Enrollees pursuant to Medicare law to Series 16-08-483, a designated series of Plaintiff MSP Recovery Claims, Series LLC and to MSP Recovery, LLC ("Emblem Assignment"). The Emblem Assignment expressly provides, in pertinent part:

> Assignor hereby irrevocably assigns, transfers, conveys, sets over and delivers to Assignee, and any of its successors and assigns, any and all of Assignor's right, title, ownership and interest in and to all Assigned Medicare Recovery Claims, whether based in contract, tort, statutory right, and any and all rights (including, but not limited to, subrogation) to pursue and/or recover monies that Assignor had, may have had, or has asserted against any party in connection with the Assigned Medicare Recovery Claims and all rights and claims against primary payers and/or, subject to the definition of Assigned Medicare Recovery Claims, third parties that may be liable to Assignor arising from or relating to the Assigned Medicare Recovery Claims, including claims under consumer protection statutes and laws, and all information relating thereto, as may be applicable . . . .

The transfer, grant, right, or assignment of any and all of Assignor's right, title, ownership, interest and entitlements in and to the Assigned Medicare Recovery Claims shall remain the confidential and exclusive property of Assignee or its assigns. This assignment is irrevocable and absolute.

Emblem Recovery Agreement, at 2.

120.    The "Medicare Recovery Claims" assigned to MSPRC include Emblem's:

"legal and equitable rights to seek reimbursement and/or recover payments from primary payers . . . responsible to [Emblem] directly or through rights conferred on [Emblem] pursuant to state and/or federal law pertaining to beneficiaries, for Health Care Services provided to [Emblem's] Medicare (as defined above) enrollees arising under state and/or federal laws, including common law subrogation theories, that provide for the reimbursement of payments made by [Emblem] . . . pursuant to a Medicare Advantage Plan[.]

*Id.* at 1.

121.    The "Assigned Medicare Recovery Claims" included the above-referenced Medicare Recovery Claims but excluded "Medicare Recovery Claims that [could] be asserted against Assignor's members, enrollees and/or contracted providers" and Medicare Recovery Claims that as of March 20, 2018 (the Effective Date of the agreement) had been assigned to and/or were being pursued "by other recovery vendors" for services rendered within a defined six-year time period. *Id.* These excluded claims are defined in the Emblem Assignment as "Assignor Retained Claims." *Id.* Before filing this lawsuit, MSPRC verified, through discussion with Emblem and/or a review of Emblem's records, that the claims at issue do not include any "that as of March 20, 2018 . . . had been assigned to and/or were being pursued" by "other recovery vendors." No claims brought in this Third Amended Complaint are subject to any carveouts and no claims are being pursued by another assignee, third-parties, or recovery vendor acting upon Emblem's behalf.

122.    On April 4, 2018, MSP Recovery, LLC assigned the rights it had acquired in the Emblem Assignment to Series 16-08-483, a designated series of MSPRC ("Series Assignment"). The Series Assignment from MSP Recovery, LLC to Series 16-08-483, which was ratified and approved by Emblem, states:

MSP Recovery, LLC ("Assignor"), for and in consideration of the sum of … and other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, hereby irrevocably assigns, sells, transfers, conveys, sets over and delivers to Assignee, **Series 16-08-483, a designated series of MSP Recovery Claims, Series LLC,** a Delaware Series Limited Liability Company, and its successors and assigns, any and all of Assignor's right, title, ownership and interest in and to the "Assigned Claims", "Claims", "Assigned Assets" "Assigned Medicare Recovery Claims" and "Assigned Documents" (and all proceeds and products thereof) as such terms may be defined in the March 20, 2018 Assignment Agreement[.]

Series Assignment, at p. 1 (emphasis in original). Consideration was given between the parties in executing this assignment.

123.    This Complaint seeks recovery only for claims Emblem assigned to Series 16-08-1483. All Emblem claims at issue in this Complaint, and all Emblem claims data currently in MSPRC's possession, were assigned to MSPRC through the Emblem Assignment. Indeed, MSPRC has possession of the claims data for each example of non-reimbursement identified in this Complaint solely because Emblem provided that data to MSPRC pursuant to the Emblem Assignment.

124.    Before filing this lawsuit, MSPRC verified, through discussion with Emblem and/or a review of Emblem's records, that the claims at issue do not include any that Emblem has retained or assigned to any other vendor, and that only MSPRC alone had been assigned these claims. In this manner, MSPRC confirmed that the claims are at issue not subject to any carveout in any assignment agreement. As such, no claims brought in this Complaint are subject to any carveouts and no claims are being pursued by another assignee, third-parties, or recovery vendor acting upon Emblem's behalf.

**Assignment of Fallon Community Health Plan's ("FHCP") Claims to Series 17-04-631**

125.    MSPRC's claims in this lawsuit stem from its assignment agreements with FCHP, an MAO.  On June 19, 2017, FCHP irrevocably assigned all its rights and claims to recover against any liable entity (including Defendants) for payments made on behalf of its beneficiaries pursuant to Medicare law to MSP Recovery, LLC. Specifically, the FCHP Assignment states the following:

> [FCHP] hereby irrevocably assigns, transfers, conveys, sets over and delivers to MSP Recovery, and any of its successors and assigns, any and all of [FCHP's] right, title, ownership and interest in and to all Claims existing on the date hereof, whether based in contract, tort, statutory right, and any and all rights (including, but not limited to, subrogation) to pursue and/or recover monies for [FCHP] that [FCHP] had, may have had, or has asserted against any party in connection with Claims and all rights and claims against primary payers and/or third parties that may be liable to [FCHP] arising from or relating to the Claims, including claims under consumer protection statutes and laws, and all information relating thereto, all of which shall constitute the "Assigned Claims."

FCHP Assignment, § 4.1.

126.    On June 20, 2017, MSP Recovery, LLC irrevocably assigned all rights acquired under the FCHP Assignment to Series 17-04-631, LLC, a designated series of Plaintiff MSP Recovery Claims, Series LLC:

> [Assignor] irrevocably assigns, sells, transfers, conveys, sets over and delivers to Assignee and its successors and assigns, any and all of Assignor's rights, title, ownership and interest in and to the [claims] (and all proceeds and products thereof) as such terms are defined in the Recovery Agreement dated June 19, 2017, by and among [FCHP] and MSP Recovery, LLC . . . .

127.    The FCHP Assignment provided for future assignments of claims to MSPRC (through its Designated Series, Series 17-04-631) via data transfers:

> [FCHP] acknowledges that Claims that arise after the Effective Date of this Agreement ("Prospective Claims") shall also be assigned to MSP Recovery as the Client's data is transferred to MSP Recovery for Claims' analysis and to pursue possible recovery on the Assigned Claims.

FCHP Assignment, § 4.2. In accordance with this express provision, FCHP has repeatedly made further transfers of claims data to Series 17-04-631, thus assigning those additional claims against Liberty to MSPRC (as the assignee of MSP Recovery, LLC).

128.    To erase even the slightest doubt, effective June 29, 2019, FCHP executed an addendum to the FCHP Assignment ("FCHP Addendum"). This addendum was in favor of the assignee, Series 17-04-631, a Designated Series of MSPRC. Through this addendum, FCHP ratified

its assignments of claims to MSPRC (through its Designated Series) via ongoing data transfers, for

all dates of service up to and including the date of the addendum:

> [FCHP] hereby irrevocably assigns, transfers, conveys, sets over and delivers to [Series 17-04-631], including any successor(s) and assigns, any and all of [FCHP's] right, title, ownership and interest in and to all of [FCHP's] Claims evidenced by all claims data transferred to [Series 17-04-631's] service provider, MSP Recovery, LLC, and encompassing dates of service up to and including June 29, 2019 (to the extent not otherwise previously assigned), i.e., the Assigned Claims. The assignment of the Assigned Claims set forth herein is irrevocable and absolute and is broad with respect to recovery efforts and is not limited to any particular recovery strategy regarding reimbursement or recovery efforts.

FCHP Addendum, at 2.

129.    This Complaint seeks recovery only for claims FCHP assigned to MSPRC through its

Designated Series (Series 17-04-631). All claims at issue in this Complaint, and all FCHP claims data

currently in MSPRC's possession, were assigned to MSPRC, either through the original written FCHP

Assignment, FCHP's subsequent assignments in connection with ongoing data transfers (as ratified

in the FCHP Addendum), or through the FCHP Addendum itself. Indeed, MSPRC is only in

possession of the claims data for each beneficiary identified in this lawsuit because FCHP provided

that data to MSPRC as part of the aforementioned assignments.

130.    Before filing this lawsuit, MSPRC verified, through discussion with FCHP and/or a

review of FCHP's records, that the claims at issue do not include any that FCHP has retained or

assigned to any other vendor, and that only MSPRC alone had been assigned these claims. In this

manner, MSPRC confirmed that the claims at issue are not subject to any carveout in any assignment

agreement. As such, no claims brought in this Complaint are subject to any carveouts and no claims

are being pursued by another assignee, third-parties, or recovery vendor acting upon FCHP's behalf.

**Assignment of SummaCare's Claims to Series 16-11-509**

131.    On May 12, 2017, SummaCare, Inc. ("SummaCare") irrevocably assigned all its rights

and claims to recovery against any liable entity (including Defendants) for payments made on behalf

of its beneficiaries pursuant to Medicare law to MSP Recovery, LLC. Specifically, the SummaCare

Assignment states:

> [SummaCare] irrevocably assigns, transfers, conveys, and sets over and delivers to
> MSP Recovery, and any of its successors and assigns, any and all of [SummaCare's]
> right, title, ownership and interest in and to all Claims existing on the date hereof
> whether based in contract, tort, statutory right, and any and all rights (including, but
> not limited to, subrogation) to pursue and/or recover monies for [SummaCare] that
> [SummaCare] had, may have had, or has asserted against any party in connection with
> the Claims and all rights and claims against primary payers  and/or third parties that
> may be liable to [SummaCare] arising from or relating to the Claims, including claims
> under consumer protection statutes and laws, and all information relating thereto, all
> of which shall constitute the "Assigned Claims.

SummaCare Recovery Agreement, at 4.1.

132.    On June 12, 2017, MSP Recovery, LLC irrevocably assigned all rights required under

the SummaCare Assignment to Series 16-11-509, a designated series of Plaintiff:

> [Assignor] . . . irrevocably assigns, sells, transfers, conveys, sets over and delivers to
> Assignee and its successors and assigns, any and all of Assignor's right, title,
> ownership and interest in and to the "Assigned Claims", "Claims", "Assigned Assets",
> and "Assigned Documents" (and all proceeds and products thereof) as such terms are
> defined in the Recovery Agreement dated May 12, 2017, by and among [SummaCare]
> . . . and MSP Recovery, LLC . . .

133.    SummaCare consented to, acknowledged, approved, and ratified the assignment from

MSP Recovery, LLC to Series 16-11-509, which is memorialized in a letter dated September 5, 2018.

134.    Consideration was given between each party in executing these assignments.

135.    This Complaint seeks recovery only for claims SummaCare assigned to Series 16-11-

509. All SummaCare claims at issue in this Complaint, and all SummaCare claims data currently in

MSPRC's possession, were assigned to MSPRC through the SummaCare Assignment. Indeed,

MSPRC has possession of the claims data for each example of non-reimbursement identified in this

Complaint solely because SummaCare provided that data to MSPRC pursuant to the SummaCare

Assignment.

136.    Before filing this lawsuit, MSPRC verified, through discussion with SummaCare

and/or a review of SummaCare's records, that the claims at issue do not include any that SummaCare

has retained or assigned to any other vendor, and that only MSPRC alone had been assigned these claims. In this manner, MSPRC confirmed that the claims are at issue not subject to any carveout in any assignment agreement. As such, no claims brought in this Complaint are subject to any carveouts and no claims are being pursued by another assignee, third-parties, or recovery vendor acting upon SummaCare's behalf.

**Assignment of Health Alliance Connect, Inc ("HEAL")'s Claims to Series 23-05-1945**

137.    MSPRC 44's claims in this lawsuit stem from its assignment agreements with HEAL. On March 19, 2019, HEAL irrevocably assigned all its rights and claims to recovery against any liable entity (including Defendants) for payments made on behalf of its Enrollees pursuant to Medicare law to MSP Recovery, LLC. Specifically, the HEAL Assignment states the following:

> With the exception of mass tort claims, [HEAL] assigns, transfers, conveys, sets over and delivers to MSP Recovery, and any of its successors and assigns, any and all of [HEAL's] right, title, ownership and interest in and to (i) all Claims existing on the date hereof, whether based in contract, tort, statutory right, and all related recovery rights arising from the health care claims data transferred to MSP Recovery, and (ii) any and all causes of action and legal or equitable rights (including, but not limited to, subrogation) to pursue and/or recover monies related to the Claims that [HEAL] had, may have had, or has asserted against any party in connection with the Claims and (iii) all causes of action and rights and claims, legal or equitable, against primary payers, Responsible Parties and/or third parties that may be liable to [HEAL] arising from or relating to the Claims, including claims under consumer protection statutes and laws (all of the Claims and rights set forth in (i)-(iii), the "Assigned Claims").

HEAL Assignment, at 1.1.1.

138.    Furthermore, the HEAL Assignment defines "Claims" as follows:

[HEAL] has or may in the future have certain legal and equitable rights to seek reimbursement, recover payments and/or seek damages from primary payers and any other party or entity that may be responsible to [HEAL] . . . whose failure, directly or through rights conferred on [HEAL] pursuant to state and/or federal law pertaining to beneficiaries, for health care services provided to any of its members or enrollees for the provision of health care services arising either from (i) contractual agreements, which may include but not be limited to agreements with the Centers for Medicare & Medicare Services ("CMS"), along with such other participation and network agreements in place containing applicable capitation and risk sharing arrangements, and/or (ii) state and/or federal laws that provide for the reimbursement of conditional payments made by [HEAL], whether under Parts A, B and D of the Medicare Act,

including pursuant to a Medicare Advantage Plan or otherwise, including the right to recover claims for health care services that are billed on a fee for service basis and all outstanding liens, potential liens, lien rights and subrogation recovery rights in favor of [HEAL] against recoveries by enrollees, including in any litigation, such as but not limited to mass tort actions, class actions and multi-district litigation for which a primary payer has demonstrated responsibility, all of the forgoing defined as the "Claims[.]"

HEAL Assignment, at B.

139.    In addition, the assignment provides:

The act of transferring any claims data by [HEAL] to MSP Recovery in accordance with section 2.1 below constitutes [HEAL's] affirmative election to assign, and to continue to assign, to MSP Recovery all causes of action and Claims reimbursement and recovery rights arising from said transferred data and shall constitute the grant, assignment and conveyance of all right, title and Interest in and to the Claims identified or arising from the [HEAL's] transferred data and shall constitute Assigned Claims.

HEAL Assignment, at 1.2. In accordance with this express provision, HEAL has repeatedly made further data transfers and has assigned new claims to MSPRC 44 (as the assignee of MSP Recovery, LLC). The date of the most recent data transfer assignment appears to be January 29, 2020. The claims that HEAL has assigned via subsequent data transfer include claims for dates of service that extend beyond March 19, 2019.

140.    On April 10, 2019, MSP Recovery, LLC irrevocably assigned all rights acquired under the HEAL Assignment to Series 17-03-583, a designated series of MSP Recovery Claims, Series LLC ("Series Assignment"):

The Assignor hereby irrevocably assigns, transfers, conveys, sets over and delivers to Assignee and its successors and assigns, any and all of Assignor's right, title, ownership and interest in and to the "Claims" and "Assigned Claims", and all proceeds and products thereof (collectively, the "Assigned Claims") as such terms are defined in the Recovery Agreement.

Series Assignment, at 1.

141.    Further, on October 22, 2020, Series 17-03-583 entered into an assignment agreement with Series 44-20-583, a designated series of MSPRC 44, whereby it irrevocably assigned all rights it acquired through its assignment agreement with MSP Recovery, LLC

44

("Series Assignment II"). This third assignment agreement was executed by individuals of majority, of sound mind, and with legal authority to bind the respective parties, and was entered into under Florida law:

> [Series 17-03-583] . . . hereby irrevocably assigns, transfers, conveys, sets over, and delivers to [Series 44-20-583] and its successors and assigns, (i) any and all of Assignor's right, title, ownership, and interest in and to that Agreement, as well as (ii) the "Claims" and "Assigned Claims", and all proceeds and products thereof (collectively the "Assigned Claims") as such terms are defined in the Agreement.
>
> This Assignment includes all the Assigned Claims irrespective of when the claims were vested in [HEAL], inclusive of any and all claim(s), causes of actions, proceeds, products, and distributions of any kind, and proceeds of proceeds, in respect thereof, whether based in contract, tort, statutory right, and any and all rights (including, but not limited to, subrogation) to pursue and/or recover monies that [Series 17-03-583] had, may have had, or has asserted against any party, including claims under consumer protection statutes and laws, any and all rights and claims against primary payers and/or third parties that may be liable to [HEAL] arising from or relating to the Claims and all information relating thereto.

Series Assignment II, at 1.

142.    After this lawsuit was filed, Series 44-20-583, a designated series of MSPRC 44, assigned the HEAL assignment to Series 23-05-1945, a designated series of MSPRC. This final assignment document, dated May 31, 2023, provides:

> Assignor: Series 44-20-583, a designated series of MSP Recovery Claims Series 44, LLC, a Delaware series limited liability company
> Assignee: Series 23-05-1945, a designated series of MSP Recovery Claims, Series LLC, a Delaware series limited liability company
>
> On March 19, 2019, a Recovery Agreement & Assignment was entered into by and among Health Alliance Medical Plans, Inc. ("HAMP") and MSP Recovery, LLC, a Florida limited liability company ("MSP") (the "Agreement"). On April 10, 2019, MSP irrevocably assigned all rights acquired under the Agreement to Series 17-03-583, a designated series of MSP Recovery Claims, Series LLC ("Series 17-03-583"). On October 22, 2020, Series 17-03-583 assigned all rights under the Agreement to Assignor.
>
> KNOW ALL MEN BY THESE PRESENTS, that the undersigned Assignor, for and in consideration of the sum of Ten Dollars ($10.00) and other good and valuable consideration, the receipt of which is hereby acknowledged, hereby irrevocably assigns, transfers, conveys, sets over, and delivers to Assignee and its successors and assigns, (i) any and all of Assignor's rights, title, ownership, obligations, and interest in and to

the Agreement, as well as (ii) the "Claims" and "Assigned Claims", and all proceeds and products thereof (collectively the "Assigned Claims") as such terms are defined in the Agreement.

This Assignment includes all the Assigned Claims irrespective of when the claims were vested in HAMP, inclusive of any and all claim(s), causes of actions, proceeds, products, and distributions of any kind, and proceeds of proceeds, in respect thereof, whether based in contract, tort, statutory right, and any and all rights (including, but not limited to, subrogation) to pursue and/or recover monies that Assignor had, may have had, or has asserted against any party, including claims under consumer protection statutes and laws, any and all rights and claims against primary payers and/or third parties that may be liable to HAMP arising from or relating to the Claims and all information relating thereto. The transfer, grant, right, or assignment of any and all right, title, ownership, interest, and entitlements in and to the Assigned Claims shall remain the exclusive property of Assignee or its successors and assigns. The intent of the parties is to transfer any and all rights, title, and interest that Assignor obtained from the Agreement.

143.    Consideration was given between each party in executing these assignments.

144.    This Complaint seeks recovery only for claims HEAL assigned to MSPRC, through its Designated Series (Series 23-05-1945). All claims at issue in this Complaint, and all claims data currently in MSPRC's possession, were assigned to MSPRC, either through the original HEAL Assignment or a later data transfer. Indeed, MSPRC is only in possession of the claims data for each beneficiary identified in this lawsuit because HEAL provided that data to MSPRC as part of the aforementioned assignments. At the time of each assignment, HEAL was the sole owner of each claim it assigned to MSPRC, as stated in the written assignment agreement.

145.    Before filing this lawsuit, MSPRC verified, through discussion with HEAL and/or a review of HEAL's records, that the claims at issue do not include any that HEAL has retained or assigned to any other vendor, and that only MSPRC alone had been assigned these claims. In this manner, MSPRC confirmed that the claims at issue are not subject to any carveout in any assignment agreement. As such, no claims brought in this Complaint are subject to any carveouts and no claims are being pursued by another assignee, third-parties, or recovery vendor acting upon HEAL's behalf.

**Assignment of Health First Health Plan ("HFHP")'s Claims to Series 23-05-1946**

146.    Effective April 28, 2016, HFHP, a Medicare Advantage organization, irrevocably assigned all rights to recover payments made on behalf of its Enrollees to MSP Recovery, LLC (the "HFHP Assignment"). The HFHP Assignment expressly provides, in pertinent part:

> Client hereby irrevocably assigns, transfers, conveys, sets over and delivers to MSP Recovery, and any of its successors and assigns, any and all of Client's right, title ownership and interest in and to all Claims existing on the date hereof, whether based in contract, tort statutory right, and any and all rights (including, but not limited to subrogation) to pursue and/or recover monies for Client that Client had, may have had, or has asserted against any party in connection with the Claims and all rights and claims against primary payers and/or third partis that may be liable to Client arising from or relating to the Claims, including claims under consumer protection statutes and laws, and all information relating thereto . . . all of which shall constitute the "Assigned Claims."
>
> *                *                *                *
>
> The transfer, grant, right, or assignment of any and all of Client's right, title, ownership, interest and entitlements in and to the Assigned Claims shall remain the confidential and exclusive property of MSP Recovery or its assigns. This assignment is irrevocable and absolute.

HFHP Assignment.

147.    On June 12, 2017, MSP Recovery, LLC assigned all rights acquired under the HFHP Assignment to Series 16-05-456, a designated series of MSPRC (the "Series Assignment I"). The Series Assignment I states:

> [T]he undersigned Assignor . . . irrevocably assigns, sells, transfers, conveys, sets over and delivers to Assignee and its successors and assigns, any and all of Assignor's right, title, ownership and interest in and to the Claims and Assigned Claims, (and all proceeds and products thereof, including any related assigned assets and assigned documents) as such terms are defined or contained in that certain (1) Assignment and (2) Addendum to the Recovery Agreement and Assignment Addendum, both given and effective April 28, 2016 and executed on June 1, 2018, by and between Health First Health Plans, Inc., a Florida corporation and Medicare Advantage Organization and party to contract number H1099 with The Centers for Medicare & Medicaid Services, as the "Client" and health plan assignor, and [MSP Recovery], a Florida limited liability company (the "Assignment"); irrespective of when the claims were vested in Client, inclusive of any and all claim(s), causes of actions, proceeds, products and distributions of any kind, and proceeds of proceeds, in respect thereof, whether based in contract, tort, statutory right, and any and all rights (including, but not limited to, subrogation) to pursue and/or recover monies that Assignor had, may have had, or has asserted against any party pursuant to the Assignment from the Client, including

claims under consumer protection statutes and laws, any and all rights and claims against primary payers and/or third parties that may be liable to Client arising from or relating to the Claims and all information relating thereto

Series Assignment I.

148.    Further, on October 22, 2020, Series 16-05-456 entered into an assignment agreement with Series 44-20-456, a designated series of Series 44, whereby it irrevocably assigned all rights it acquired through its assignment agreement with MSP Recovery, LLC ("Series Assignment II"). The Series Assignment II was executed by individuals of majority, of sound mind, and with legal authority to bind the respective parties, and was entered into under Florida law:

> [Series 16-05-456] . . . hereby irrevocably assigns, transfers, conveys, sets over, and delivers to [Series 44-20-456] and its successors and assigns, (i) any and all of Assignor's right, title, ownership, and interest in and to the [claims], as well as (ii) the "Claims" and "Assigned Claims", and all proceeds and products thereof (collectively the "Assigned Claims") as such terms are defined in the Agreements.
>
> This Assignment includes all the Assigned Claims irrespective of when the claims were vested in HFHP, inclusive of any and all claim(s), causes of actions, proceeds, products, and distributions of any kind, and proceeds of proceeds, in respect thereof, whether based in contract, tort, statutory right, and any and all rights (including, but not limited to, subrogation) to pursue and/or recover monies that Assignor had, may have had, or has asserted against any party, including claims under consumer protection statutes and laws, any and all rights and claims against primary payers and/or third parties that may be liable to HFHP arising from or relating to the Claims and all information relating thereto.

Series Assignment II.

149.    Effective January 1, 2021, Series 44-20-456, a Designated Series of MSP Recovery Claims Series 44, LLC, purchased HFHP's remaining payment interest in the claims, including all claims with dates of service ranging from February 5, 2007, through January 3, 2020 (the "Purchase Agreement"). The Purchase Agreement ratified HFHP's previous assignment of claims to MSP Recovery Claims Series 44, LLC in connection with ongoing data transfers since the effective date of the April 2016 HFHP Assignment. In referencing the prior 2016 HFHP Assignment as the "Recovery Agreement," the Purchase Agreement provides:

> From the effective date of the Recovery Agreement through the date of this Purchase Agreement, Assignor made various transfers of data to MSP Recovery allowing

48

analysis and identification of reimbursable recoveries. The data transmitted by Assignor to MSP Recovery ("Claims Data") occurred on the dates: June 8, 2016, November 7, 2016, December 6, 2016, February 6, 2020 and February 24, 2020. and thus, all Claims arising therefrom are deemed Assigned Claims. The Claims Data transmitted by Assignor to MSP Recovery on June 8, 2016, November 7, 2016 and December 6, 2016, which encompassed dates of service between February 5, 2007 and November 23, 2016 were the subject of a stand-alone Assignment document signed by Assignor on June l. 2018 and made effective as of April 28, 2016. The Claims arising from the Claims Data transmitted by Seller to MSP Recovery February 6, 2020 and February 24, 2020 are also deemed Assigned Claims. Series 44-20-456 currently owns all of the right, title and interest in the Assigned Claims.

. . . The Parties wish to enter into this Purchase Agreement in order for Purchaser to acquire Seller's Contingent Payment Interest (as defined below) in exchange for a lump sum payment as described herein

Purchase Agreement, at Preliminary Statement, §§ C, D. The purchase Agreement then provides that "[HFHP sells all of [HFHP's] rights" under the prior April 2016 HFHP Assignment and later data transfers, "including any amount payable to [HFHP] by MSP Recovery, [Series 44-20-456], or any of their affiliates or assigns that have accrued prior to and up to the Effective Date of this Purchase Agreement." *Id.*, at § 1.1. Through this language, MSP Recovery Claims Series 44, LLC, through its designated Series 44-20-456, purchased any remaining interest HFHP may have retained as it relates to payment from recoveries for previously assigned claims, including for the beneficiaries identified in this lawsuit. The Purchase Agreement provides that it is governed by Florida Law.

150.    After this lawsuit was filed, Series 44-20-456, a designated series of MSPRC 44, assigned the HFHP assignment to Series 23-05-1946, a designated series of MSPRC. This final assignment document, dated May 31, 2023, provides:

Assignor: Series 44-20-456, a designated series of MSP Recovery Claims Series 44, LLC, a Delaware series limited liability company

Assignee: Series 23-05-1946, a designated series of MSP Recovery Claims, Series LLC, a Delaware series limited liability company

Through a series of agreements, Health First Health Plans, Inc. ("HFHP"), a Medicare Advantage Organization, irrevocably assigned all rights to recover conditional payments made on behalf of its enrollees to MSP Recovery, LLC, a Florida limited liability company ("MSP"):

(i)     On April 28, 2016, a Recovery Agreement was entered into by and among Health First Administrative Plans, Inc. ("HFAP"), acting on behalf of HFHP, and MSP (the "Recovery Agreement").

(ii)    On June 12, 2017, MSP irrevocably assigned all rights acquired under the Recovery Agreement to Series 16-05-456, a designated series of MSP Recovery Claims, Series LLC ("Series 16-05-456").

(iii)   On June 1, 2018, HFHP entered into a Nunc Pro Tunc Assignment with MSP. MSP also irrevocably assigned all rights acquired under the Nunc Pro Tunc Assignment to Series 16-05-456.

(iv)    On October 22, 2020, Series 16-05-456 assigned all rights acquired under the Agreement to Assignor.

All of these agreements and assignments referenced above between HFHP, HFAP, MSP, and Assignor are collectively referred to as the "Agreements".

KNOW ALL MEN BY THESE PRESENTS, that the undersigned Assignor, for and in consideration of the sum of Ten Dollars ($10.00) and other good and valuable consideration, the receipt of which is hereby acknowledged, hereby irrevocably assigns, transfers, conveys, sets over, and delivers to Assignee and its successors and assigns, (i) any and all of Assignor's rights, title, ownership, obligations, and interest in and to the Agreements, as well as (ii) the "Claims" and "Assigned Claims", and all proceeds and products thereof (collectively the "Assigned Claims") as such terms are defined in the Agreements.

This Assignment includes all the Assigned Claims irrespective of when the claims were vested in HFHP, inclusive of any and all claim(s), causes of actions, proceeds, products, and distributions of any kind, and proceeds of proceeds, in respect thereof, whether based in contract, tort, statutory right, and any and all rights (including, but not limited to, subrogation) to pursue and/or recover monies that Assignor had, may have had, or has asserted against any party, including claims under consumer protection statutes and laws, any and all rights and claims against primary payers and/or third parties that may be liable to HFHP arising from or relating to the Claims and all information relating thereto. The transfer, grant, right, or assignment of any and all right, title, ownership, interest, and entitlements in and to the Assigned Claims shall remain the exclusive property of Assignee or its successors and assigns. The intent of the parties is to transfer any and all rights, title, and interest that Assignor obtained from the Agreement.

151.    Consideration was given between each party in executing these assignments.

152.    This Complaint seeks recovery only for claims HFHP assigned to Series 23-05-1946.

All HFHP claims at issue in this Complaint, and all HFHP claims data currently in MSPRC's possession, were assigned to MSPRC through the HFHP Assignment. Indeed, MSPRC has possession

of the claims data for each example of non-reimbursement identified in this Complaint solely because HFHP provided that data to MSPRC pursuant to the HFHP Assignment.

153.    Before filing this lawsuit, MSPRC verified, through discussion with HFHP and/or a review of HFHP's records, that the claims at issue do not include any that HFHP has retained or assigned to any other vendor, and that only MSPRC alone had been assigned these claims. In this manner, MSPRC confirmed that the claims at issue are not subject to any carveout in any assignment agreement. As such, no claims brought in this Complaint are subject to any carveouts and no claims are being pursued by another assignee, third-parties, or recovery vendor acting upon HFHP's behalf.

### Assignment of Blue Cross Blue Shield of Rhode Island ("BCBSRI")'s Claims to Series 23-05-1946

154.    MSPRC's claims in this lawsuit stem from its assignment agreement with Blue Cross Blue Shield of Rhode Island ("BCBSRI"), an MAO. On May 30, 2019, BCBSRI entered into a Statement of Work and Claims Purchase Agreement & Assignment with MSP Recovery, LLC, whereby it irrevocably assigned to MSP Recovery, LLC all rights to recover payments pursuant to the MSP law (the "BCBSRI Assignment"). The BCBSRI Assignment specifically states:

> Client irrevocably assigns, transfers, conveys, sets over and delivers to MSP Recovery, and any of its successors and assigns, any and all of Client's right, title, ownership and interest in and to (i) all Claims for which it has sent claims data to MSP Recovery, LLC, whether based in contract, tort or statutory right, and all related to recovery rights arising from and related all claims data transferred to MSP Recovery, LLC, and (ii) any and all causes of action, claims and demands of whatsoever nature relating to payments for healthcare services provided to Client's members and enrollees, and related legal or equitable rights (including, but not limited to, subrogation) to pursue and/or recover monies related to the Claims that Client had, may have had, or has asserted against any party in connection with the Claims and (iii) all causes of action, claims, rights and demands of whatsoever nature, legal or equitable, against primary payers, Responsible Parties and/or third parties that may be liable to Client arising from or relating to the Claims, including claims under consumer protection statutes and laws (all of the Claims and rights set forth in (i)-(iii), the *Assigned Claims*").

BCBSRI Assignment, at 1.2.1.

155.     Thereafter, effective on June 10, 2019, MSP Recovery, LLC irrevocably assigned all rights acquired under the BCBSRI Assignment to Series 16-05-461, a designated series of MSP Recovery Claims, Series LLC (the "Series Assignment I"). The Series Assignment from MSP Recovery, LLC to Series 16-05-461 states:

> The Assignor hereby irrevocably assigns, transfers, conveys, sets over and delivers to Assignee and its successors and assigns, any and all of Assignor's right, title, ownership and interest in and to the "Claims" and "Assigned Claims", and all proceeds and products thereof (collectively the "***Assigned Claims***") as such terms are defined in the ***Recovery Agreement***. This Assignment includes all the Assigned Claims irrespective of when the claims were vested in ***BCBS Rhode Island***, inclusive of any and all claim(s), causes of actions, proceeds, products and distributions of any kind, and proceeds of proceeds, in respect thereof, whether based in contract, tort, statutory right, and any and all rights (including, but not limited to, subrogation) to pursue and/or recover monies that Assignor had, may have had, or has asserted against any party, including claims under consumer protection statutes and laws, any and all rights and claims against primary payers and/or third parties that may be liable to ***BCBS Rhode Island*** arising from or relating to the Claims and all information relating thereto.

Series Assignment I, at 1.

156.     The BCBSRI Assignment contemplated that the Parties would enter into a "stand-alone assignment document evidencing the BCBSRI Assignment at § 5.1. Following the contemplated due diligence period, the stand-alone assignment became effective May 30, 2019, thereby approving and consenting to the Series Assignment and all rights contained therein, including all claims and reimbursement rights, to and in favor of MSP Recovery Claims, Series LLC or any of its designated series, including but not limited to, Series 16-05-461.

157.     Further, on October 22, 2020, Series 16-05-461 entered into an assignment agreement with Series 44-20-461, a designated series of MSPRC 44, whereby Series 16-05-461 irrevocably assigned all rights it acquired through its assignment agreement with MSP Recovery, LLC (the "Series Assignment II"). This third written assignment agreement was executed by individuals of majority, of sound mind, and with legal authority to bind the respective parties, and was entered into under Florida law:

[Series 16-05-461] . . . hereby irrevocably assigns, transfers, conveys, sets over, and delivers to [Series 44-20-461] and its successors and assigns, (i) any and all of Assignor's right, title, ownership, and interest in and to that Agreement, as well as (ii) the "Claims" and "Assigned Claims", and all proceeds and products thereof (collectively the "Assigned Claims") as such terms are defined in the Agreement.

This Assignment includes all the Assigned Claims irrespective of when the claims were vested in BCBSRI, inclusive of any and all claim(s), causes of actions, proceeds, products, and distributions of any kind, and proceeds of proceeds, in respect thereof, whether based in contract, tort, statutory right, and any and all rights (including, but not limited to, subrogation) to pursue and/or recover monies that Assignor had, may have had, or has asserted against any party, including claims under consumer protection statutes and laws, any and all rights and claims against primary payers and/or third parties that may be liable to BCBSRI arising from or relating to the Claims and all information relating thereto.

Series Assignment II, at 1.

158.     Consideration was given between each party in executing these assignments.

159.     Further, the stand-alone assignment provides that claims may be assigned through BCBSRI's transfer of electronic claims data to Series 44-20-461 (as the assignee of MSP Recovery, LLC):

[BCBSRI] irrevocably assigns, transfers, conveys, sets over and delivers to MSP Recovery, and any of its successors and assigns, any and all of Assignor's right, title, ownership and interest in and to (i) all Claims for which it has sent claims data to MSP Recovery, LLC, whether based in contract, tort or statutory - right, and all related recovery rights arising from and related to all claims data transferred to MSP Recovery, LLC, and (ii) any and all causes of action, claims and demands of whatsoever nature relating to payments for healthcare services provided to Assignor's members and enrollees, and related legal or equitable rights (including, but not limited to, subrogation) to pursue and/or recover monies related to the Claims that Assignor had, may have had, or has asserted against any party in connection with the Claims and (iii) all causes of action, claims, rights and demands of whatsoever nature, legal or equitable, against primary payers, Responsible Parties and/or third parties that may be liable to Assignor arising from or relating to the Claims, including claims under consumer protection statutes and laws (all of the Claims and rights set forth in (i)-(iii), the "Assigned Claims"). . . . The assignment of the Assigned Claims set forth herein is irrevocable and absolute.

In accordance with this express provision, providing for assignment of all claims "for which [BCBSRI has sent claims data," BCBSRI has repeatedly made further data transfers of claims data to Series 44-20-461, with the understanding and intent that it was assigning those claims to Series 44-20-461 via

the data transfers. The claims that BCBSRI has assigned via subsequent data transfer include claims for dates of service that extend beyond May 30, 2019. The most recent of these data transfer assignments extended to claims arising on or before May 2, 2021.

160. After this lawsuit was filed, Series 44-20-461, a designated series of MSPRC 44, assigned the BCBSRI assignment to Series 23-05-1941, a designated series of MSPRC. This final assignment document, dated May 31, 2023, provides:

> On May 28, 2019, a i) Master Services Agreement and (ii) Statement of Work and Claims Recovery Agreement and Assignment, were entered into by and among Blue Cross & Blue Shield of Rhode Island ("BCBSRI") and MSP Recovery, LLC, a Florida limited liability company ("MSP") (collectively, the "Agreement"). On June 10, 2019, MSP irrevocably assigned all rights acquired under the Agreement to Series 16-05-461, a designated series of MSP Recovery Claims, Series LLC ("Series 16-05-461"). On October 22, 2020, Series 16-05-461 assigned all rights acquired under the Agreement to Assignor.

> KNOW ALL MEN BY THESE PRESENTS, that the undersigned Assignor, for and in consideration of the sum of Ten Dollars ($10.00) and other good and valuable consideration, the receipt of which is hereby acknowledged, hereby irrevocably assigns, transfers, conveys, sets over, and delivers to Assignee and its successors and assigns, (i) any and all of Assignor's rights, title, ownership, obligations, and interest in and to the Agreement, as well as (ii) the "Claims" and "Assigned Claims", and all proceeds and products thereof (collectively the "Assigned Claims") as such terms are defined in the Agreement.

> This Assignment includes all the Assigned Claims irrespective of when the claims were vested in BCBSRI, inclusive of any and all claim(s), causes of actions, proceeds, products, and distributions of any kind, and proceeds of proceeds, in respect thereof, whether based in contract, tort, statutory right, and any and all rights (including, but not limited to, subrogation) to pursue and/or recover monies that Assignor had, may have had, or has asserted against any party, including claims under consumer protection statutes and laws, any and all rights and claims against primary payers and/or third parties that may be liable to BCBSRI arising from or relating to the Claims and all information relating thereto. The transfer, grant, right, or assignment of any and all right, title, ownership, interest, and entitlements in and to the Assigned Claims shall remain the exclusive property of Assignee or its successors and assigns. The intent of the parties is to transfer any and all rights, title, and interest that Assignor obtained from the Agreement.

161. At the time of the initial May 2019 BCBSRI Assignment, and at all times since, BCBSRI has possessed ripe MSP Act claims for reimbursement based on Defendants' failure to

adhere to the ongoing and continuous statutory duty to reimburse BCBSRI for conditional payments made to Medicare beneficiaries.

162.     This Complaint seeks recovery only for claims BCBSRI has assigned to MSPRC through its Designated Series (Series 23-05-1941). All claims at issue in this Complaint, and all claims data currently in MSPRC's possession, were assigned to MSPRC, either through the original written BCBSRI Assignment or through a subsequent assignment via data transfer.  No claims brought in this Complaint are subject to any carveouts and no claims are being pursued by another assignee, third-parties, or recovery vendor acting upon BCBSRI's behalf.

### Assignment of Family Physicians Group d/b/a Family Physicians of Winter Park, Inc ("Family Physician")'s Claims to Series 23-05-1942

163.     On October 6, 2017, Family Physicians Group ("FPGI") dba Family Physicians of Winter Park, P.A. irrevocably assigned to MSP Recovery, LLC all its rights under the MSP Act to recover against any liable primary payer (including Defendants) for accident-related payments made on behalf of its Enrollees ("FPGI Assignment"). Specifically, the FPGI Assignment states the following:

> [FPGI] hereby assigns, transfers, conveys, sets over and delivers to MSP Recovery, and any of its successors and assigns, any and all of [FPGI]'s right, title, ownership and interest in and to those Claims transferred to MSP Recovery for Claims' analysis and recovery pursuit on the date of transferring said claims, whether based in contract, tort, statutory right, and any and all rights (including, but not limited to, subrogation) to pursue and/or recover monies for [FPGI] that [FPGI] had, may have had, or has asserted against any party in connection with the Claims and all rights and claims against primary payers and/or third parties that may be liable to [FPGI] arising from or relating to the Claims, including claims under consumer protection statutes and laws, and all information relating thereto, all of which shall constitute the "Assigned Claims".

FPGI Assignment at § 4.1.

164.     On October 10, 2017, MSP Recovery, LLC irrevocably assigned all rights acquired under the FPGI Assignment to Series 17-05-634, a designated series of MSPRC ("Series 17-05-634 Assignment"):

> Assignor … irrevocably assigns, sells, transfers, conveys, sets over and delivers to Assignee and its successors and assigns, any and all of Assignor's right, title, ownership and interest in and to the [Assigned Claims] (and all proceeds and products thereof) as such terms are defined in the [FPGI Assignment] … inclusive of any and all claim(s), causes of actions, proceeds, products and distributions of any kind, and proceeds of proceeds, in respect thereof, whether based in contract, tort, statutory right, and any and all rights (including, but not limited to, subrogation) to pursue and/or recover monies that Assignor had, may have had, or has asserted against any party pursuant to the [FPGI Assignment[], including any claims under consumer protection statutes and laws, any and all rights and claims against primary payers and/or third parties that may be liable to Client arising from or relating to the Claims and all information relating thereto. The transfer, grant, right, or assignment of any and all of Client's right, title, ownership, interest and entitlements in and to the [FPGI Assignment] shall remain the confidential and exclusive property of Assignee or its assigns. The intent of the parties is to transfer any and all rights title and interest that MSP Recovery LLC obtained as an assignee from the assignor.

Series 17-05-634 Assignment at p. 1.

165. On October 22, 2020, Series 17-05-634 irrevocably assigned all rights it acquired from MSP Recovery, LLC to Series 44-20-634, a designated series of Series 44 ("Series 44-20-634 Assignment"):

> Assignor . . . hereby irrevocably assigns, transfers, conveys, sets over, and delivers to Assignee and its successors and assigns, (i) any and all of Assignor's right, title, ownership, and interest in and to [the FPGI Assignment], as well as (ii) the "Claims" and "Assigned Claims", and all proceeds and products thereof (collectively the "Assigned Claims") as such terms are defined in the [FPGI Assignment].

> This Assignment includes all the Assigned Claims irrespective of when the claims were vested in [FPGI], inclusive of any and all claim(s), causes of actions, proceeds, products, and distributions of any kind, and proceeds of proceeds, in respect thereof, whether based in contract, tort, statutory right, and any and all rights (including, but not limited to, subrogation) to pursue and/or recover monies that Assignor had, may have had, or has asserted against any party, including claims under consumer protection statutes and laws, any and all rights and claims against primary payers and/or third parties that may be liable to [FPGI] arising from or relating to the Claims and all information relating thereto.

Series 44-20-634 Assignment at p. 1.

166. After this lawsuit was filed, Series 44-20-634, a designated series of MSPRC, assigned the FPGI assignment to Series 23-05-1944, a designated series of MSPRC. This final assignment document, dated May 31, 2023, provides:

Assignor: Series 44-20-634, a designated series of MSP Recovery Claims Series 44, LLC, a Delaware series limited liability company

Assignee: Series 23-05-1944, a designated series of MSP Recovery Claims, Series LLC, a Delaware series limited liability company

On October 6, 2017, a Recovery Agreement was entered into by and among Family Physicians Group ("FPG") and MSP Recovery, LLC, a Florida limited liability company ("MSP") (the "Agreement"). On October 10, 2017, MSP irrevocably assigned all rights acquired under the Agreement to Series 17-05-634, a designated series of MSP Recovery Claims, Series LLC ("Series 17-05-634"). Assignor. On October 22, 2020, Series 17-05-634 assigned all rights acquired under the Agreement to Assignor.

KNOW ALL MEN BY THESE PRESENTS, that the undersigned Assignor, for and in consideration of the sum of Ten Dollars ($10.00) and other good and valuable consideration, the receipt of which is hereby acknowledged, hereby irrevocably assigns, transfers, conveys, sets over, and delivers to Assignee and its successors and assigns, (i) any and all of Assignor's rights, title, ownership, obligations, and interest in and to the Agreement, as well as (ii) the "Claims" and "Assigned Claims", and all proceeds and products thereof (collectively the "Assigned Claims") as such terms are defined in the Agreement.

This Assignment includes all the Assigned Claims irrespective of when the claims were vested in FPG, inclusive of any and all claim(s), causes of actions, proceeds, products, and distributions of any kind, and proceeds of proceeds, in respect thereof, whether based in contract, tort, statutory right, and any and all rights (including, but not limited to, subrogation) to pursue and/or recover monies that Assignor had, may have had, or has asserted against any party, including claims under consumer protection statutes and laws, any and all rights and claims against primary payers and/or third parties that may be liable to FPG arising from or relating to the Claims and all information relating thereto. The transfer, grant, right, or assignment of any and all right, title, ownership, interest, and entitlements in and to the Assigned Claims shall remain the exclusive property of Assignee or its successors and assigns. The intent of the parties is to transfer any and all rights, title, and interest that Assignor obtained from the Agreement.

167.    Consideration was given between each party in executing the FPGI Assignment, the

Series 17-05-634 Assignment, and the Series 44-20-634 Assignment.

**Assignment of Blue Cross Blue Shield of Massachusetts ("BCBSMA")'s
Claims to Series 23-05-1942**

168.    Plaintiff has the legal right to pursue its MSP Act claim pursuant to a valid assignment

agreement from BCBCMA.

169.     On December 18, 2018, BCBSMA irrevocably assigned to MSP Recovery, LLC any

and all of its rights to recover payments made on behalf of its Enrollees ("BCBSMA Assignment").

The BCBSMA Assignment expressly provides, in pertinent part:

> Client irrevocably assigns, transfers, conveys, sets over and delivers to MSP
> Recovery, and any of its successors and assigns, any and all of Client's right, title,
> ownership and interest in and to all recovery and reimbursement rights against
> Responsible Parties arising from and related to the Medicare Secondary Payer Act
> in connection with Client's Claims that are identified on a data transfer following
> execution of this Assignment and Recovery Agreement, exclusive of the claims
> identified on a carve out list, and including any and all legal or equitable rights to
> pursue and/or recover monies related to the Claims that Client had, may have had,
> or has asserted against any party in connection with the Claims and all rights and
> claims, legal or equitable, against primary payers, Responsible Parties and/or third
> parties that may be liable to Client arising from or relating to the Claims, all of the
> described Claims herein constituting the "Assigned Claims Rights".

BCBSMA Assignment § 1.

170.     In the Assignment, the "Assigned Claims Rights" excluded "claims identified on a

carve out list" as well as "(i) any Claims rights belonging to Client that are currently being pursued

directly by Client or by another Client vendor, all of which will be specifically identified by Client

and included on a Carve Out List, and (ii) unless approved by Client, any claims or lien recoveries in

class action, antitrust, medical device, pharmaceutical or multidistrict litigation not directly related to

the Medicare Secondary Payer statute." *Id*. at § 1.1.4.

171.     The claims in this case, such as those for P.R. and A.D., were transferred from

BCBSMA to MSP Recovery, LLC, through a data transfer, as contemplated by the BCBSMA

Assignment. None of the claims in this case are listed on BCBSMA's carve out list or otherwise

excluded from the scope of the assignment. Further, the claims alleged here are all "directly related

to the Medicare Secondary Payer statute."

172.     On April 10, 2019, MSP Recovery, LLC assigned the rights it had acquired in the

BCBSMA Assignment to Series 15-11-388, a designated series of MSP Recovery Claims, Series LLC

("Series Assignment"). The Series Assignment from MSP Recovery, LLC to Series 15-11- 388, which

was ratified and approved by BCBSMA, states:

> The Assignor hereby irrevocably assigns, transfers, conveys, sets over and delivers to Assignee and its successors and assigns, any and all of Assignor's right, title, ownership and interest in and to the "Claims" and "Assigned Claims", any and all proceeds and products thereof (collectively the ***"Assigned Claims"***) as such terms are defined in the Recovery Agreement.

173.    On October 22, 2020, the BCBSMA assignment was transferred to a different entity. On that date, Series 15-11-388 entered into an assignment agreement with Series 44-20-388, a designated series of Series 44, whereby it irrevocably assigned all rights it acquired through its assignment agreement with MSP Recovery, LLC. This third assignment agreement provided:

> [Series 15-11-388] . . . hereby irrevocably assigns, transfers, conveys, sets over, and delivers to [Series 44-20-388] and its successors and assigns, (i) any and all of Assignor's right, title, ownership, and interest in and to that Agreement, as well as (ii) the "Claims" and "Assigned Claims", and all proceeds and products thereof (collectively the "Assigned Claims") as such terms are defined in the Agreement.

> This Assignment includes all the Assigned Claims irrespective of when the claims were vested in BCBSMA, inclusive of any and all claim(s), causes of actions, proceeds, products, and distributions of any kind, and proceeds of proceeds, in respect thereof, whether based in contract, tort, statutory right, and any and all rights (including, but not limited to, subrogation) to pursue and/or recover monies that Assignor had, may have had, or has asserted against any party, including claims under consumer protection statutes and laws, any and all rights and claims against primary payers and/or third parties that may be liable to BCBSMA arising from or relating to the Claims and all information relating thereto.

174.    After this lawsuit was filed, Series 44-20-388, a designated series of MSPRC, assigned the BCBSMA assignment to Series 23-05-1942, a designated series of MSPRC. This final assignment document, dated May 31, 2023, provides:

> Assignor: **Series 44-20-388**, a designated series of MSP Recovery Claims Series 44, LLC, a Delaware series limited liability company

> Assignee: **Series 23-05-1942**, a designated series of MSP Recovery Claims, Series LLC, a Delaware series limited liability company

> On December 18, 2018, an Assignment and Recovery Agreement was entered into by and among Blue Cross and Blue Shield of Massachusetts HMO Blue, Inc. ("BCBSMA") and MSP Recovery, LLC, a Florida limited liability company ("MSP") (the "Agreement"). On April 10, 2019, MSP irrevocably assigned all rights acquired under the Agreement to Series 15-11-388, a designated series of MSP Recovery

Claims, Series LLC ("Series 15-11-388"). On October 22, 2020, Series 15-11-388 assigned all rights acquired under the Agreement to Assignor.

KNOW ALL MEN BY THESE PRESENTS, that the undersigned Assignor . . . , hereby irrevocably assigns, transfers, conveys, sets over, and delivers to Assignee and its successors and assigns, (i) any and all of Assignor's rights, title, ownership, obligations, and interest in and to the Agreement, as well as (ii) the "Claims" and "Assigned Claims", and all proceeds and products thereof (collectively the "Assigned Claims") as such terms are defined in the Agreement.

This Assignment includes all the Assigned Claims irrespective of when the claims were vested in BCBSMA, inclusive of any and all claim(s), causes of actions, proceeds, products, and distributions of any kind, and proceeds of proceeds, in respect thereof, whether based in contract, tort, statutory right, and any and all rights (including, but not limited to, subrogation) to pursue and/or recover monies that Assignor had, may have had, or has asserted against any party, including claims under consumer protection statutes and laws, any and all rights and claims against primary payers and/or third parties that may be liable to BCBSMA arising from or relating to the Claims and all information relating thereto. The transfer, grant, right, or assignment of any and all right, title, ownership, interest, and entitlements in and to the Assigned Claims shall remain the exclusive property of Assignee or its successors and assigns. The intent of the parties is to transfer any and all rights, title, and interest that Assignor obtained from the Agreement.

175.    Consideration was given between each party in executing these assignments.

## B.    **The First Party Claim Representative Beneficiaries**

**R.L.**

176.    On October 6, 2019, R.L. was enrolled in a Medicare Advantage Plan issued by HFHP, an MAO and MSPRC's Designated Series assignor in this action.

177.    On October 6, 2019, R.L. was injured in an automobile accident. As a direct and proximate result of the accident, R.L. sustained injuries that required medical items and services, including treatment at the Emergency Department, and x-rays of R.L.'s ankle, knee, and foot.

178.    At the time of the accident, R.L.'s accident-related medical costs and expenses were covered under a policy issued by Defendants with policy number 929110639000. By virtue of the policy, Defendants were obligated to pay and provide primary coverage for R.L.'s accident-related medical expenses.

179.    The accident-related medical services were rendered October 6, 2019. The medical

providers subsequently issued bills for payment of R.L.'s accident-related medical expenses to HFHP. The medical providers billed and charged HFHP $1,159.98 for R.L.'s accident-related medical expenses, of which HFHP paid $352.63 between October 16, 2019 and November 6, 2019.

180.    At the time HFHP executed its assignment agreement in favor of MSP Recovery, LLC (which was later transferred to MSPRC), HFHP's right to seek reimbursement for R.L.'s accident-related treatment was never assigned to and/or pursued by other recovery vendors. HFHP held all recovery rights to R.L.'s accident-related treatment and conveyed them to MSPRC. HFHP did not retain the recovery right to R.L.'s claim.

181.    By virtue of the policy which covered R.L., Defendants are a primary payer responsible for payment and/or reimbursement of R.L.'s accident-related medical expenses.

182.    Through a reporting agent, Defendants reported information to CMS regarding the accident, the name of the reporting entity (vaguely provided as "Progressive Group of Ins Compani[es]"), the type of insurance policy involved (no-fault), and the policy number, and admitted Defendants' recognition that R.L.'s accident-related medical expenses were covered by the policy. As a matter of law, Defendants could only issue this report "after" having made a payment for R.L.'s accident-related medical expenses. 42 U.S.C. § 1395y(b)(8).

183.    Despite knowing R.L. was Medicare eligible and that Medicare or an MAO would likely have a lien once it paid for treatments, Defendants chose not to further investigate for a specific entity and attempt to contact HFHP to coordinate benefits. Defendants' failure to share information with the secondary payer was a violation of 42 C.F.R. § 411.25.

184.    If Defendants had informed HFHP that primary coverage was available, as that regulation required, HFHP could have continued pursuing R.L.'s claim and could have forwarded R.L.'s medical bills on to Defendants. As an MAO, HFHP had a right to be "subrogated to any individual, provider, . . . or any other entity entitled to payment by a primary payer." 42 C.F.R. §

411.26(a); *see* 42 C.F.R. § 422.108(f) (providing MAOs "the same rights to recover from a primary plan, entity, or individual that the Secretary exercises under MSP regulations in subparts B through D of part 411 of this chapter.").

185.    Due to Defendants' failure to reach out to HFHP to provide information about primary coverage, HFHP paid R.L.'s medical expenses in the dark.

186.    In the time since the incident, Defendants have enjoyed the use of HFHP's funds to the detriment of the Medicare system.

187.    MSPRC and its assignors expended a great deal of effort and resources to uncover Defendants' failures in the handling of R.L.'s claims and the unjust enrichment Defendants have benefitted from during this period of noncompliance. As HFHP's assignee, MSPRC instituted this action to recover the debt.

188.    Accordingly, MSPRC is entitled to collect double damages against Defendants for the failure to reimburse HFHP's conditional payment for R.L.'s accident-related medical expenses.

**J.B.**

189.    On December 25, 2019, J.B. was enrolled in a Medicare Advantage Plan issued by HFHP, an MAO and MSPRC's Designated Series assignor in this action.

190.    On December 25, 2019, J.B. was injured in an automobile accident. As a direct and proximate result of the accident, J.B. sustained injuries that required medical items and services, including treatment at the Emergency Department, a sternum fracture, a CT of J.B.'s head/brain, neck, spine, thorax, abdomen, and pelvis; and, x-rays of J.B.'s lower leg, knee, and foot.

191.    At the time of the accident, J.B.'s accident-related medical costs and expenses were covered under a policy issued by Defendants with policy number 923713396002. By virtue of the policy, Defendants were obligated to pay and provide primary coverage for J.B.'s accident-related medical expenses.

192.     The accident-related medical services were rendered December 25, 2019; December 27, 2019; December 30, 2019; January 10, 2020; January 30, 2020; February 21, 2020. The medical providers subsequently issued bills for payment of J.B.'s accident-related medical expenses to HFHP. The medical providers billed and charged HFHP $109,478.20 for J.B.'s accident-related medical expenses, of which HFHP paid $1,491.91 between January 5, 2020 and September 6, 2020.

193.     At the time HFHP executed its assignment agreement in favor of MSP Recovery, LLC (which was later transferred to MSPRC), HFHP's right to seek reimbursement for J.B.'s accident-related treatment was never assigned to and/or pursued by other recovery vendors. HFHP held all recovery rights to J.B.'s accident-related treatment and conveyed them to MSPRC. HFHP did not retain the recovery right to J.B.'s claim.

194.     By virtue of the policy which covered J.B., Defendants are a primary payer responsible for payment and/or reimbursement of J.B.'s accident-related medical expenses.

195.     Through a reporting agent, Defendants reported information to CMS regarding the accident, the name of the reporting entity (vaguely provided as "Progressive Group of Ins Compani[es]"), the type of insurance policy involved (no-fault), and the policy number, and admitted Defendants' recognition that J.B.'s accident-related medical expenses were covered by the policy. As a matter of law, Defendants could only issue this report "after" having made a payment for J.B.'s accident-related medical expenses. 42 U.S.C. § 1395y(b)(8).

196.     Despite knowing J.B. was Medicare eligible and that Medicare or an MAO would likely have a lien once it paid for treatments, Defendants chose not to further investigate for a specific entity and attempt to contact HFHP to coordinate benefits. Defendants' failure to share information with the secondary payer was a violation of 42 C.F.R. § 411.25.

197.     If Defendants had informed HFHP that primary coverage was available, as that regulation required, HFHP could have continued pursuing J.B.'s claim and could have forwarded

63

J.B.'s medical bills on to Defendants. As an MAO, HFHP had a right to be "subrogated to any individual, provider, . . . or any other entity entitled to payment by a primary payer." 42 C.F.R. § 411.26(a); *see* 42 C.F.R. § 422.108(f) (providing MAOs "the same rights to recover from a primary plan, entity, or individual that the Secretary exercises under MSP regulations in subparts B through D of part 411 of this chapter.").

198.    Due to Defendants' failure to reach out to HFHP to provide information about primary coverage, HFHP paid J.B.'s medical expenses in the dark.

199.    In the time since the incident, Defendants have enjoyed the use of HFHP's funds to the detriment of the Medicare system.

200.    MSPRC and its assignors expended a great deal of effort and resources to uncover Defendants' failures in the handling of J.B.'s claims and the unjust enrichment Defendants have benefitted from during this period of noncompliance. As HFHP's assignee, MSPRC instituted this action to recover the debt.

201.    Accordingly, MSPRC is entitled to collect double damages against Defendants for the failure to reimburse HFHP's conditional payment for J.B.'s accident-related medical expenses.

**N.B.**

202.    On December 2, 2019, N.B. was enrolled in a Medicare Advantage Plan issued by HFHP, an MAO and MSPRC's Designated Series assignor in this action.

203.    On December 2, 2019, N.B. was injured in an automobile accident. As a direct and proximate result of the accident, N.B. sustained injuries that required medical items and services, including treatment at the Emergency Department, a neck injury, a CT of N.B.'s head, neck, and spine; and a shoulder x-ray.

204.    At the time of the accident, N.B.'s accident-related medical costs and expenses were covered under a policy issued by Defendants with policy number 923567691002. By virtue of the

policy, Defendants were obligated to pay and provide primary coverage for N.B.'s accident-related medical expenses.

205.     The accident-related medical services were rendered December 2, 2019. The medical providers subsequently issued bills for payment of N.B.'s accident-related medical expenses to HFHP. The medical providers billed and charged HFHP $7,243.62 for N.B.'s accident-related medical expenses, of which HFHP paid $71.42 between December 15, 2019 and May 10, 2020.

206.     At the time HFHP executed its assignment agreement in favor of MSP Recovery, LLC (which was later transferred to MSPRC), HFHP's right to seek reimbursement for N.B.'s accident-related treatment was never assigned to and/or pursued by other recovery vendors. HFHP held all recovery rights to N.B.'s accident-related treatment and conveyed them to MSPRC. HFHP did not retain the recovery right to N.B.'s claim.

207.     By virtue of the policy which covered N.B., Defendants are a primary payer responsible for payment and/or reimbursement of N.B.'s accident-related medical expenses.

208.     Through a reporting agent, Defendants reported information to CMS regarding the accident, the name of the reporting entity (vaguely provided as "Progressive Group of Ins Compani[es]"), the type of insurance policy involved (no-fault), and the policy number, and admitted Defendants' recognition that N.B.'s accident-related medical expenses were covered by the policy. As a matter of law, Defendants could only issue this report "after" having made a payment for N.B.'s accident-related medical expenses. 42 U.S.C. § 1395y(b)(8).

209.     Despite knowing N.B. was Medicare eligible and that Medicare or an MAO would likely have a lien once it paid for treatments, Defendants chose not to further investigate for a specific entity and attempt to contact HFHP to coordinate benefits. Defendants' failure to share information with the secondary payer was a violation of 42 C.F.R. § 411.25.

210.     If Defendants had informed HFHP that primary coverage was available, as that

regulation required, HFHP could have continued pursuing N.B.'s claim and could have forwarded N.B.'s medical bills on to Defendants. As an MAO, HFHP had a right to be "subrogated to any individual, provider, . . . or any other entity entitled to payment by a primary payer." 42 C.F.R. § 411.26(a); *see* 42 C.F.R. § 422.108(f) (providing MAOs "the same rights to recover from a primary plan, entity, or individual that the Secretary exercises under MSP regulations in subparts B through D of part 411 of this chapter.").

211. Due to Defendants' failure to reach out to HFHP to provide information about primary coverage, HFHP paid N.B.'s medical expenses in the dark.

212. In the time since the incident, Defendants have enjoyed the use of HFHP's funds to the detriment of the Medicare system.

213. MSPRC and its assignors expended a great deal of effort and resources to uncover Defendants' failures in the handling of N.B.'s claims and the unjust enrichment Defendants have benefitted from during this period of noncompliance. As HFHP's assignee, MSPRC instituted this action to recover the debt.

214. Accordingly, MSPRC is entitled to collect double damages against Defendants for the failure to reimburse HFHP's conditional payment for N.B.'s accident-related medical expenses.

**I.M.**

215. On December 27, 2020, I.M. was enrolled in a Medicare Advantage Plan issued by HFHP, an MAO and MSPRC's Designated Series assignor in this action.

216. On December 27, 2020, I.M. was injured in an automobile accident. As a direct and proximate result of the accident, I.M. sustained injuries that required medical items and services, including treatment at the Emergency Department, chest pain, and a CT of I.M.'s thorax.

217. At the time of the accident, I.M.'s accident-related medical costs and expenses were

covered under a policy issued by Defendants with policy number 925905563004.[19] By virtue of the policy, Defendants were obligated to pay and provide primary coverage for I.M.'s accident-related medical expenses.

218.    The accident-related medical services were rendered December 27, 2020. The medical providers subsequently issued bills for payment of I.M.'s accident-related medical expenses to HFHP. The medical providers billed and charged HFHP $6,445.93 for I.M.'s accident-related medical expenses, of which HFHP paid $712.32 between January 6, 2021 and October 3, 2021.

219.    At the time HFHP executed its assignment agreement in favor of MSP Recovery, LLC (which was later transferred to MSPRC), HFHP's right to seek reimbursement for I.M.'s accident-related treatment was never assigned to and/or pursued by other recovery vendors. HFHP held all recovery rights to I.M.'s accident-related treatment and conveyed them to MSPRC. HFHP did not retain the recovery right to I.M.'s claim.

220.    By virtue of the policy which covered I.M., Defendants are a primary payer responsible for payment and/or reimbursement of I.M.'s accident-related medical expenses.

221.    Through its reporting agent, Defendants reported information to CMS regarding the accident, the name of the reporting entity (vaguely provided as "Progressive Group of Ins Companie[s]"), the type of insurance policy involved (no-fault), and the policy number, and admitted Defendants' recognition that I.M.'s accident-related medical expenses were covered by the policy. As a matter of law, Defendants could only issue this report "after" having made a payment for I.M.'s accident-related medical expenses. 42 U.S.C. § 1395y(b)(8).

222.    Despite knowing I.M. was Medicare eligible and that Medicare or an MAO would likely have a lien once it paid for treatments, Defendants chose not to further investigate for a specific

---

[19]Defendants (as the vague "Progressive") also reported I.M.'s accident as a settlement, with the policy number 201993784.

entity and attempt to contact HFHP to coordinate benefits. Defendants' failure to share information with the secondary payer was a violation of 42 C.F.R. § 411.25.

223. If Defendants had informed HFHP that primary coverage was available, as that regulation required, HFHP could have continued pursuing I.M.'s claim and could have forwarded I.M.'s medical bills on to Defendants. As an MAO, HFHP had a right to be "subrogated to any individual, provider, . . . or any other entity entitled to payment by a primary payer." 42 C.F.R. § 411.26(a); *see* 42 C.F.R. § 422.108(f) (providing MAOs "the same rights to recover from a primary plan, entity, or individual that the Secretary exercises under MSP regulations in subparts B through D of part 411 of this chapter.").

224. Due to Defendants' failure to reach out to HFHP to provide information about primary coverage, HFHP paid I.M.'s medical expenses in the dark.

225. In the time since the incident, Defendants have enjoyed the use of HFHP's funds to the detriment of the Medicare system.

226. MSPRC and its assignors expended a great deal of effort and resources to uncover Defendants' failures in the handling of I.M.'s claims and the unjust enrichment Defendants have benefitted from during this period of noncompliance. As HFHP's assignee, MSPRC instituted this action to recover the debt.

227. Accordingly, MSPRC is entitled to collect double damages against Defendants for the failure to reimburse HFHP's conditional payment for I.M.'s accident-related medical expenses.

**G.F.**

228. On October 18, 2017, G.F. was enrolled in a Medicare Advantage Plan issued by Summacare, Inc., an MAO and MSPRC's Designated Series assignor in this action.

229. On October 18, 2017, G.F. was injured in an automobile accident. As a direct and proximate result of the accident, G.F. sustained injuries that required medical items and services,

including treatment at the Emergency Department, a wedge compression fracture of second thoracic vertebra, a thorax injury, a CT of G.F.'s head, neck, spine, thorax, abdomen, and pelvis, and an x-ray of G.F.'s spine.

230.    At the time of the accident, G.F.'s accident-related medical costs and expenses were covered under a policy issued by Defendants. By virtue of the policy, Defendants were obligated to pay and provide primary coverage for G.F.'s accident-related medical expenses.

231.    The accident-related medical services were rendered October 18, 2017; October 20, 2017; November 10, 2017; December 11, 2017; February 12, 2018. The medical providers subsequently issued bills for payment of G.F.'s accident-related medical expenses to Summacare, Inc. The medical providers billed and charged Summacare, Inc. $22,441.00 for G.F.'s accident-related medical expenses, of which Summacare, Inc. paid $1,958.00 between November 1, 2017 and June 4, 2018.

232.    At the time Summacare, Inc. executed its assignment agreement in favor of MSP Recovery, LLC (which was later transferred to MSPRC), Summacare, Inc.'s right to seek reimbursement for G.F.'s accident-related treatment was never assigned to and/or pursued by other recovery vendors. Summacare, Inc. held all recovery rights to G.F.'s accident-related treatment and conveyed them to MSPRC. Summacare, Inc. did not retain the recovery right to G.F.'s claim.

233.    By virtue of the policy which covered G.F., Defendants are a primary payer responsible for payment and/or reimbursement of G.F.'s accident-related medical expenses.

234.    Through a reporting agent, Defendants reported information to CMS regarding the accident, the name of the reporting entity (vaguely provided as "Progressive Group of Ins Compani[es]"), and the type of insurance policy involved (no-fault), and admitted Defendants' recognition that G.F.'s accident-related medical expenses were covered by its policy. As a matter of law, Defendants could only issue this report "after" having made a payment for G.F.'s accident-related

medical expenses. 42 U.S.C. § 1395y(b)(8).

235.     Despite knowing G.F. was Medicare eligible and that Medicare or an MAO would likely have a lien once it paid for treatments, Defendants chose not to further investigate for a specific entity and attempt to contact Summacare, Inc. to coordinate benefits. Defendants' failure to share information with the secondary payer was a violation of 42 C.F.R. § 411.25.

236.     If Defendants had informed Summacare, Inc. that primary coverage was available, as that regulation required, Summacare, Inc. could have continued pursuing G.F.'s claim and could have forwarded G.F.'s medical bills on to Defendants. As an MAO, Summacare, Inc. had a right to be "subrogated to any individual, provider, . . . or any other entity entitled to payment by a primary payer." 42 C.F.R. § 411.26(a); *see* 42 C.F.R. § 422.108(f) (providing MAOs "the same rights to recover from a primary plan, entity, or individual that the Secretary exercises under MSP regulations in subparts B through D of part 411 of this chapter.").

237.     Due to Defendants' failure to reach out to Summacare, Inc. to provide information about primary coverage, Summacare, Inc. paid G.F.'s medical expenses in the dark.

238.     In the time since the incident, Defendants have enjoyed the use of Summacare, Inc.'s funds to the detriment of the Medicare system.

239.     MSPRC and its assignors expended a great deal of effort and resources to uncover Defendants' failures in the handling of G.F.'s claims and the unjust enrichment Defendants have benefitted from during this period of noncompliance. As Summacare, Inc.'s assignee, MSPRC instituted this action to recover the debt.

240.     Accordingly, MSPRC is entitled to collect double damages against Defendants for the failure to reimburse Summacare, Inc.'s conditional payment for G.F.'s accident-related medical expenses.

**D.D.**

241.     On July 11, 2018, D.D. was enrolled in a Medicare Advantage Plan issued by AvMed, Inc., an MAO and MSPRC's Designated Series assignor in this action.

242.     On July 11, 2018, D.D. was injured in an accident. As a direct and proximate result of the accident, D.D. sustained injuries that required medical items and services, including treatment at the Emergency Department, dorsalgia, pleurodynia, cervicalgia, contusion of the left breast, and an x-ray of D.D.'s ribs/chest, neck, and spine.

243.     At the time of the accident, D.D.'s accident-related medical costs and expenses were covered under a policy issued by Defendants with policy number 919711699000. By virtue of the policy, Defendants were obligated to pay and provide primary coverage for D.D.'s accident-related medical expenses.

244.     The accident-related medical services were rendered July 11, 2018. The medical providers subsequently issued bills for payment of D.D.'s accident-related medical expenses to AvMed, Inc. The medical providers billed and charged AvMed, Inc. $5,575.00 for D.D.'s accident-related medical expenses, of which AvMed, Inc. paid $718.00.

245.     At the time AvMed, Inc. executed its assignment agreement in favor of MSP Recovery, LLC (which was later transferred to MSPRC), AvMed, Inc.'s right to seek reimbursement for D.D.'s accident-related treatment was never assigned to and/or pursued by other recovery vendors. AvMed, Inc. held all recovery rights to D.D.'s accident-related treatment and conveyed them to MSPRC. AvMed, Inc. did not retain the recovery right to D.D.'s claim.

246.     By virtue of the policy which covered D.D., Defendants are a primary payer responsible for payment and/or reimbursement of D.D.'s accident-related medical expenses.

247.     Through its reporting agent, Defendants reported information to CMS regarding the accident, the name of the reporting entity (vaguely provided as "Progressive Group of Ins

Compani[es]"), the type of insurance policy involved (no-fault), and the policy number, and admitted Defendants' recognition that D.D.'s accident-related medical expenses were covered by the policy. As a matter of law, Defendants could only issue this report "after" having made a payment for D.D.'s accident-related medical expenses. 42 U.S.C. § 1395y(b)(8).

248.     Despite knowing D.D. was Medicare eligible and that Medicare or an MAO would likely have a lien once it paid for treatments, Defendants chose not to further investigate for a specific entity and attempt to contact AvMed, Inc. to coordinate benefits. Defendants' failure to share information with the secondary payer was a violation of 42 C.F.R. § 411.25.

249.     If Defendants had informed AvMed, Inc. that primary coverage was available, as that regulation required, AvMed, Inc. could have continued pursuing D.D.'s claim and could have forwarded D.D.'s medical bills on to Defendants. As an MAO, AvMed, Inc. had a right to be "subrogated to any individual, provider, . . . or any other entity entitled to payment by a primary payer." 42 C.F.R. § 411.26(a); *see* 42 C.F.R. § 422.108(f) (providing MAOs "the same rights to recover from a primary plan, entity, or individual that the Secretary exercises under MSP regulations in subparts B through D of part 411 of this chapter.").

250.     Due to Defendants' failure to reach out to AvMed, Inc. to provide information about primary coverage, AvMed, Inc. paid D.D.'s medical expenses in the dark.

251.     In the time since the incident, Defendants have enjoyed the use of AvMed, Inc.'s funds to the detriment of the Medicare system.

252.     MSPRC and its assignors expended a great deal of effort and resources to uncover Defendants' failures in the handling of D.D.'s claims and the unjust enrichment Defendants have benefitted from during this period of noncompliance. As AvMed, Inc.'s assignee, MSPRC instituted this action to recover the debt.

253.     Accordingly, MSPRC is entitled to collect double damages against Defendants for

the failure to reimburse AvMed, Inc.'s conditional payment for D.D.'s accident-related medical expenses.

**A.B.**

254.    On April 16, 2018, A.B. was enrolled in a Medicare Advantage Plan issued by AvMed, Inc., an MAO and MSPRC's Designated Series assignor in this action.

255.    On April 16, 2018, A.B. was injured in an accident. As a direct and proximate result of the accident, A.B. sustained injuries that required medical items and services, including treatment at the Emergency Department, a displaced fracture of distal phalanx of left little finger, open fracture, and an x-ray exam of finger(s).

256.    At the time of the accident, A.B.'s accident-related medical costs and expenses were covered under a policy issued by Defendants with policy number 80162658018. By virtue of the policy, Defendants were obligated to pay and provide primary coverage for A.B.'s accident-related medical expenses.

257.    The accident-related medical services were rendered April 16, 2018; April 23, 2018; May 1, 2018; May 3, 2018. The medical providers subsequently issued bills for payment of A.B.'s accident-related medical expenses to AvMed, Inc. The medical providers billed and charged AvMed, Inc. $6,137.00 for A.B.'s accident-related medical expenses, of which AvMed, Inc. paid $324.00.

258.    At the time AvMed, Inc. executed its assignment agreement in favor of MSP Recovery, LLC (which was later transferred to MSPRC), AvMed, Inc.'s right to seek reimbursement for A.B.'s accident-related treatment was never assigned to and/or pursued by other recovery vendors. AvMed, Inc. held all recovery rights to A.B.'s accident-related treatment and conveyed them to MSPRC. AvMed, Inc. did not retain the recovery right to A.B.'s claim.

259.    By virtue of the policy which covered A.B., Defendants are a primary payer responsible for payment and/or reimbursement of A.B.'s accident-related medical expenses.

260.     Through a reporting agent, Defendants reported information to CMS regarding the accident, the name of the reporting entity (vaguely provided as "Progressive Group of Ins Compani[es]"), the type of insurance policy involved (no-fault), and the policy number, and admitted Defendants' recognition that A.B.'s accident-related medical expenses were covered by the policy. As a matter of law, Defendants could only issue this report "after" having made a payment for A.B.'s accident-related medical expenses. 42 U.S.C. § 1395y(b)(8).

261.     Despite knowing A.B. was Medicare eligible and that Medicare or an MAO would likely have a lien once it paid for treatments, Defendants chose not to further investigate for a specific entity and attempt to contact AvMed, Inc. to coordinate benefits. Defendants' failure to share information with the secondary payer was a violation of 42 C.F.R. § 411.25.

262.     If Defendants had informed AvMed, Inc. that primary coverage was available, as that regulation required, AvMed, Inc. could have continued pursuing A.B.'s claim and could have forwarded A.B.'s medical bills on to Defendants. As an MAO, AvMed, Inc. had a right to be "subrogated to any individual, provider, . . . or any other entity entitled to payment by a primary payer." 42 C.F.R. § 411.26(a); *see* 42 C.F.R. § 422.108(f) (providing MAOs "the same rights to recover from a primary plan, entity, or individual that the Secretary exercises under MSP regulations in subparts B through D of part 411 of this chapter.").

263.     Due to Defendants' failure to reach out to AvMed, Inc. to provide information about primary coverage, AvMed, Inc. paid A.B.'s medical expenses in the dark.

264.     In the time since the incident, Defendants have enjoyed the use of AvMed, Inc.'s funds to the detriment of the Medicare system.

265.     MSPRC and its assignors expended a great deal of effort and resources to uncover Defendants' failures in the handling of A.B.'s claims and the unjust enrichment Defendants have benefitted from during this period of noncompliance. As AvMed, Inc.'s assignee, MSPRC instituted

this action to recover the debt.

266.    Accordingly, MSPRC is entitled to collect double damages against Defendants for the failure to reimburse AvMed, Inc.'s conditional payment for A.B.'s accident-related medical expenses.

**E.G.**

267.    On June 12, 2018, E.G. was enrolled in a Medicare Advantage Plan issued by FCHP, an MAO and MSPRC's Designated Series assignor in this action.

268.    On June 12, 2018, E.G. was injured in an accident. As a direct and proximate result of the accident, E.G. sustained injuries that required medical items and services, including treatment at the Emergency Department, a neck injury, contusion of thorax front wall, chest pain, right lower leg injury, a CT of E.G.'s head, brain, neck, spine, thorax, abdomen, and pelvis, and an x-ray of E.G.'s lower leg.

269.    At the time of the accident, E.G.'s accident-related medical costs and expenses were covered under a policy issued by Defendants with policy number 921403824000. By virtue of the policy, Defendants were obligated to pay and provide primary coverage for E.G.'s accident-related medical expenses.

270.    The accident-related medical services were rendered June 12, 2018. The medical providers subsequently issued bills for payment of E.G.'s accident-related medical expenses to FCHP. The medical providers billed and charged FCHP $23,965.60 for E.G.'s accident-related medical expenses, of which FCHP paid $4,481.57 between September 5, 2018 and April 23, 2019.

271.    At the time FCHP executed its assignment agreement in favor of MSP Recovery, LLC (which was later transferred to MSPRC), FCHP's right to seek reimbursement for E.G.'s accident-related treatment was never assigned to and/or pursued by other recovery vendors. FCHP held all recovery rights to E.G.'s accident-related treatment and conveyed them to MSPRC. FCHP

did not retain the recovery right to E.G.'s claim.

272. By virtue of the policy which covered E.G., Defendants are a primary payer responsible for payment and/or reimbursement of E.G.'s accident-related medical expenses.

273. Through a reporting agent, Defendants reported information to CMS regarding the accident, the name of the reporting entity (vaguely provided as "Progressive Group of Ins Compani[es]"), the type of insurance policy involved (no-fault), and the policy number, and admitted Defendants' recognition that E.G.'s accident-related medical expenses were covered by its policy. As a matter of law, Defendants could only issue this report "after" having made a payment for E.G.'s accident-related medical expenses. 42 U.S.C. § 1395y(b)(8).

274. Despite knowing E.G. was Medicare eligible and that Medicare or an MAO would likely have a lien once it paid for treatments, Defendants chose not to further investigate for a specific entity and attempt to contact FCHP to coordinate benefits. Defendants' failure to share information with the secondary payer was a violation of 42 C.F.R. § 411.25.

275. If Defendants had informed FCHP that primary coverage was available, as that regulation required, FCHP could have continued pursuing E.G.'s claim and could have forwarded E.G.'s medical bills on to Defendants. As an MAO, FCHP had a right to be "subrogated to any individual, provider, . . . or any other entity entitled to payment by a primary payer." 42 C.F.R. § 411.26(a); *see* 42 C.F.R. § 422.108(f) (providing MAOs "the same rights to recover from a primary plan, entity, or individual that the Secretary exercises under MSP regulations in subparts B through D of part 411 of this chapter.").

276. Due to Defendants' failure to reach out to FCHP to provide information about primary coverage, FCHP paid E.G.'s medical expenses in the dark.

277. In the time since the incident, Defendants have enjoyed the use of FCHP's funds to the detriment of the Medicare system.

278.     MSPRC and its assignors expended a great deal of effort and resources to uncover Defendants' failures in the handling of E.G.'s claims and the unjust enrichment Defendants have benefitted from during this period of noncompliance. As FCHP's assignee, MSPRC instituted this action to recover the debt.

279.     Accordingly, MSPRC is entitled to collect double damages against Defendants for the failure to reimburse FCHP's conditional payment for E.G.'s accident-related medical expenses.

C.      **The Settlement Claim Representative Beneficiaries**

280.     In some instances, Defendants may take on the risk of loss and accident-related medical expenses incurred by their insured who is harmed by a third party. Conversely, they may bear the risk when one of their insureds is a tortfeasor who harms a Medicare beneficiary. When these instances arise, Defendants may enter into settlement agreements on behalf of their insureds.

**J.G.**

281.     On or around October 14, 2016, J.G. was enrolled in a Medicare Advantage Plan issued by BCBSRI, an MAO and MSPRC's Designated Series assignor in this action, pursuant to CMS Contract ID Number H4152.

282.     On or around October 14, 2016, J.G. was injured in an automobile accident. As a direct and proximate result of the incident, J.G. sustained injuries that required medical items and services, including treatment at the Emergency Department, cervicalgia, displaced fracture of bone in right wrist; hip pain, low back pain, CT of neck, spine, head/brain; and, an x-ray of J.G.'s hand.

283.     Defendants' insured responsible for the incident was insured by Progressive Direct Insurance Company under policy number 9098432100. J.G. was covered under that liability policy.

284.     The medical services were rendered October 14, 2016. The medical providers subsequently issued bills for payment of J.G.'s accident-related medical expenses to BCBSRI. The medical providers billed and charged BCBSRI $8,3500.00 for J.G.'s accident-related medical

expenses, of which BCBSRI paid $466.29 between October 14, 2016 and June 27, 2018.

285.    At the time BCBSRI executed its assignment agreement in favor of MSP Recovery LLC, BCBSRI's right to seek reimbursement for J.G.'s accident-related treatment was never assigned to or pursued by other recovery vendors. BCBSRI held all recovery rights to J.G.'s accident-related treatment and conveyed them to MSPRC. BCBSRI did not retain the recovery right to J.G.'s claim.

286.    Progressive Direct indemnified its insured tortfeasor and made payments pursuant to a settlement with J.G. By virtue of entering into that settlement and obtaining a release of all claims, Progressive Direct became a primary payer responsible for reimbursement of J.G.'s accident-related medical expenses.

287.    Despite knowing J.G. was Medicare eligible and that Medicare or an MAO would likely have a lien, Progressive Direct decided to settle with J.G. without making any effort to reach out to determine whether Medicare or an MAO made payments and ensure they were reimbursed.

288.    Following this settlement, Progressive Direct reported to CMS regarding the accident, the name of the reporting entity, the type of insurance policy involved, and the policy number, and admitted its primary payer status requiring it to pay or reimburse J.G.'s accident-related medical expenses.

289.    Despite reporting it was a primary payer by way of a liability settlement, and making the corresponding admission it should have paid for J.G.'s accident-related injuries, Progressive Direct failed to remit or reimburse such payments.

290.    In the time since the incident, Progressive Direct has enjoyed the use of BCBSRI's funds to the detriment of the Medicare system. Progressive Direct has made no remedial attempts to reimburse BCBSRI.

291.    Because Progressive Direct failed to inform MSPRC or its assignor about this settlement, MSPRC was forced to search in the dark for the insurer responsible for the unreimbursed

claims. The J.G. claim is just one example of this ongoing pattern.

292.    Accordingly, MSPRC is entitled to collect double damages against Progressive Direct for its failure to reimburse BCBSRI's conditional payment for J.G.'s accident-related medical expenses.

**N.G.**

293.    On or around October 14, 2016, N.G. was enrolled in a Medicare Advantage Plan issued by BCBSRI, an MAO and MSPRC's Designated Series assignor in this action, pursuant to CMS Contract ID Number H4152.

294.    On or around October 14, 2016, N.G. was injured in an automobile accident. As a direct and proximate result of the incident, N.G. sustained injuries that required medical items and services, including treatment at the Emergency Department, cervicalgia, neck muscle strain, chest pain, and CT of neck, spine, head/brain.

295.    Defendants' insured responsible for the incident was insured by Progressive Direct Insurance Company under policy number 9098432100. N.G. was covered under that liability policy.

296.    The medical services were rendered October 14, 2016. The medical providers subsequently issued bills for payment of N.G.'s accident-related medical expenses to BCBSRI. The medical providers billed and charged BCBSRI $7,858.00 for N.G.'s accident-related medical expenses, of which BCBSRI paid $403.85 between October 24, 2016 and July 4, 2018.

297.    At the time BCBSRI executed its assignment agreement in favor of MSP Recovery LLC, BCBSRI's right to seek reimbursement for N.G.'s accident-related treatment was never assigned to or pursued by other recovery vendors. BCBSRI held all recovery rights to N.G.'s accident-related treatment and conveyed them to MSPRC. BCBSRI did not retain the recovery right to N.G.'s claim.

298.    Progressive Direct indemnified its insured tortfeasor and made payments pursuant to a settlement with N.G. By virtue of entering into that settlement and obtaining a release of all claims,

Progressive Direct became a primary payer responsible for reimbursement of N.G.'s accident-related medical expenses.

299.    Despite knowing N.G. was Medicare eligible and that Medicare or an MAO would likely have a lien, Progressive Direct decided to settle with N.G., without making any effort to reach out to determine whether Medicare or an MAO made payments and ensure it was reimbursed.

300.    Following this settlement, Progressive Direct reported to CMS regarding the accident, the name of the reporting entity, the type of insurance policy involved, and the policy number, and admitted its primary payer status requiring it to pay or reimburse N.G.'s accident-related medical expenses.

301.    Despite reporting it was a primary payer by way of a liability settlement, and making the corresponding admission it should have paid for N.G.'s accident-related injuries, Progressive Direct failed to remit or reimburse such payments.

302.    In the time since the incident, Progressive Direct has enjoyed the use of BCBSRI's funds to the detriment of the Medicare system. Progressive Direct has made no remedial attempts to reimburse.

303.    Because Progressive Direct failed to inform MSPRC or its assignors about this settlement, MSPRC was forced to search in the dark for the insurer responsible for the unreimbursed claims. The N.G. claim is just one example of this ongoing pattern.

304.    Accordingly, MSPRC is entitled to collect double damages against Progressive Direct for its failure to reimburse BCBSRI's conditional payment for N.G.'s accident-related medical expenses.

**P.M.**

305.    On or around December 23, 2015, P.M. was enrolled in a Medicare Advantage Plan issued by BCBSRI, an MAO and MSPRC's Designated Series assignor in this action, pursuant to

CMS Contract ID Number H4152.

306.     On or around December 23, 2015, P.M. was injured in an incident. As a direct and proximate result of the incident, P.M. sustained injuries that required medical items and services, including treatment in an Emergency Department, x-ray of hip and pelvis.

307.     Defendants' insured responsible for the incident was insured by Progressive Direct Insurance Company under policy number 019, as reported in the Section 111 Report. P.M. was covered under that liability policy.

308.     The medical services were rendered December 26, 2015. The medical providers subsequently issued bills for payment of P.M.'s accident-related medical expenses to BCBSRI. The medical providers billed and charged BCBSRI $1,899.00 for P.M.'s accident-related medical expenses, of which BCBSRI paid $ $598.58 on January 5, 2016 and January 26, 2016.

309.     At the time BCBSRI executed its assignment agreement in favor of MSP Recovery LLC, BCBSRI's right to seek reimbursement for P.M.'s accident-related treatment was never assigned to or pursued by other recovery vendors. BCBSRI held all recovery rights to P.M.'s accident-related treatment and conveyed them to MSPRC. BCBSRI did not retain the recovery right to P.M.'s claim.

310.     Progressive Direct indemnified its insured tortfeasor and made payments pursuant to a settlement with P.M. By virtue of entering into that settlement and obtaining a release of all claims, Progressive Direct became a primary payer responsible for reimbursement of P.M.'s accident-related medical expenses.

311.     Despite knowing P.M. was Medicare eligible and that Medicare or an MAO would likely have a lien, Progressive Direct decided to settle with P.M., without making any effort to reach out to determine whether Medicare or an MAO made payments and ensure it was reimbursed.

312.     Following this settlement, Progressive Direct reported to CMS regarding the accident, the name of the reporting entity, the type of insurance policy involved, and the policy

number, and admitted its primary payer status requiring it to pay or reimburse P.M.'s accident-related medical expenses.

313.     Despite reporting it was a primary payer by way of a liability settlement, and making the corresponding admission it should have paid for P.M.'s accident-related injuries, Progressive Direct failed to remit or reimburse such payments.

314.     In the time since the incident, Progressive Direct has enjoyed the use of BCBSRI's funds to the detriment of the Medicare system. Progressive Direct has made no remedial attempts to reimburse.

315.     Because Progressive Direct failed to inform MSPRC or its assignors about this settlement, MSPRC was forced to search in the dark for the insurer responsible for the unreimbursed claims. The P.M. claim is just one example of this ongoing pattern.

316.     Accordingly, MSPRC is entitled to collect double damages against Progressive Direct for its failure to reimburse BCBSRI's conditional payment for P.M.'s accident-related medical expenses.

**C.H.**

317.     On or around January 15, 2017, C.H. was enrolled in a Medicare Advantage Plan issued by BCBSMA, an MAO and MSPRC's Designated Series assignor in this action.

318.     On or around January 15, 2017, C.H. was injured in an automobile accident. As a direct and proximate result of the incident, C.H. sustained injuries that required medical items and services, including head injury, neck injury, cervicalgia, CT of head/brain, neck, spine; and, x-ray of neck and spine.

319.     Defendants' insured responsible for the incident was insured by Progressive Direct Insurance Company under policy number 174202529. C.H. was covered under that liability policy.

320.     The medical services were rendered between January 15, 2017 and February 23,

2017. The medical providers subsequently issued bills for payment of C.H.'s accident-related medical expenses to BCBSMA. The medical providers billed and charged BCBSMA $454.94 for C.H.'s accident-related medical expenses, of which BCBSMA paid $152.53 between January 26, 2017 and April 18, 2017.

321.    At the time BCBSMA executed its assignment agreement in favor of MSP Recovery LLC, BCBSMA's right to seek reimbursement for C.H.'s accident-related treatment was never assigned to or pursued by other recovery vendors. BCBSMA held all recovery rights to C.H.'s accident-related treatment and conveyed them to MSPRC. BCBSMA did not retain the recovery right to C.H.'s claim.

322.    Progressive Direct indemnified its insured tortfeasor and made payments pursuant to a settlement with C.H. By virtue of entering into that settlement and obtaining a release of all claims, Progressive Direct became a primary payer responsible for reimbursement of C.H.'s accident-related medical expenses.

323.    Despite knowing C.H. was Medicare eligible and that Medicare or an MAO would likely have a lien, Progressive Direct decided to settle with C.H., without making any effort to reach out to determine whether Medicare or an MAO made payments and ensure it was reimbursed.

324.    Following this settlement, Progressive Direct reported to CMS regarding the accident, the name of the reporting entity, the type of insurance policy involved, and the policy number, and admitted its primary payer status requiring it to pay or reimburse C.H.'s accident-related medical expenses.

325.    Despite reporting it was a primary payer by way of a liability settlement, and making the corresponding admission it should have paid for C.H.'s accident-related injuries, Progressive Direct failed to remit or reimburse such payments.

326.    In the time since the incident, Progressive Direct has enjoyed the use of BCBSMA's

83

funds to the detriment of the Medicare system. Progressive Direct has made no remedial attempts to reimburse.

327. Because Progressive Direct failed to inform MSPRC or its assignors about this settlement, MSPRC was forced to search in the dark for the insurer responsible for the unreimbursed claims. The C.H. claim is just one example of this ongoing pattern. Accordingly, MSPRC is entitled to collect double damages against Progressive Direct for its failure to reimburse BCBSMA's conditional payment for C.H.'s accident-related medical expenses.

**J.H.**

328. On or around April 1, 2018, J.H. was enrolled in a Medicare Advantage Plan issued by HEAL, an MAO and MSPRC's Designated Series assignor in this action.

329. On or around April 1, 2018, J.H. was injured in an incident. As a direct and proximate result of the incident, J.H. sustained injuries that required medical items and services, including cervicalgia, head and neck injuries, and CT of neck and spine.

330. Defendants' insured responsible for the incident was insured by Progressive Northern Insurance Company under policy number 184418274. J.H. was covered under that liability policy.

331. The medical services were rendered on April 1, 2018 and April 3, 2018. The medical providers subsequently issued bills for payment of J.H.'s accident-related medical expenses to HEAL. The medical providers billed and charged HEAL $609.28 for J.H.'s accident-related medical expenses, of which HEAL paid $159.02 between April 3, 2018 and May 25, 2018.

332. At the time HEAL executed its assignment agreement in favor of MSP Recovery LLC, HEAL's right to seek reimbursement for J.H.'s accident-related treatment was never assigned to or pursued by other recovery vendors. HEAL held all recovery rights to J.H.'s accident-related treatment and conveyed them to MSPRC. HEAL did not retain the recovery right to J.H.'s claim.

333. Progressive Northern indemnified its insured tortfeasor and made payments pursuant

to a settlement with J.H. By virtue of entering into that settlement and obtaining a release of all claims, Progressive Northern became a primary payer responsible for reimbursement of J.H.'s accident-related medical expenses.

334.    Despite knowing J.H. was Medicare eligible and that Medicare or an MAO would likely have a lien, Progressive Northern decided to settle with J.H., without making any effort to reach out to determine whether Medicare or an MAO made payments and ensure it was reimbursed.

335.    Following this settlement, Progressive Northern reported to CMS regarding the accident, the name of the reporting entity, the type of insurance policy involved, and the policy number, and admitted its primary payer status requiring it to pay or reimburse J.H.'s accident-related medical expenses.

336.    Despite reporting it was a primary payer by way of a liability settlement, and making the corresponding admission it should have paid for J.H.'s accident-related injuries, Progressive Northern failed to remit or reimburse such payments.

337.    In the time since the incident, Progressive Northern has enjoyed the use of HEAL's funds to the detriment of the Medicare system. Progressive Northern has made no remedial attempts to reimburse.

338.    Because Progressive Northern failed to inform MSPRC or its assignors about this settlement, MSPRC was forced to search in the dark for the insurer responsible for the unreimbursed claims. The J.H. claim is just one example of this ongoing pattern.

339.    Accordingly, MSPRC is entitled to collect double damages against Progressive Northern for its failure to reimburse HEAL's conditional payment for J.H.'s accident-related medical expenses.

**S.W.**

340.    On or around May 15, 2017, S.W. was enrolled in a Medicare Advantage Plan issued

85

by ConnectiCare, an MAO and MSPRC's Designated Series assignor in this action, pursuant to CMS Contract ID Number H3528.

341.    On or around May 15, 2017, S.W. was injured in an automobile accident. As a direct and proximate result of the incident, S.W. sustained injuries that required medical items and services, including treatment at the Emergency Department, shoulder pain, a CT of neck, head, brain, chest, spine, and thorax, MRI of upper extremity joint, and x-rays of shoulder, lower leg, chest.

342.    Defendants' insured responsible for the incident was insured by Defendants under policy number 175524716. S.W. was covered under that liability policy.

343.    The medical services were rendered between May 15, 2017 and September 8, 2017. The medical providers subsequently issued bills for payment of S.W.'s accident-related medical expenses to ConnectiCare. The medical providers billed and charged ConnectiCare $96,051.36 for S.W.'s accident-related medical expenses, of which ConnectiCare paid $15,355.96 between May 25, 2017 and September 28, 2017.

344.    At the time ConnectiCare executed its assignment agreement in favor of MSP Recovery LLC, ConnectiCare's right to seek reimbursement for S.W.'s accident-related treatment was never assigned to or pursued by other recovery vendors. ConnectiCare held all recovery rights to S.W.'s accident-related treatment and conveyed them to MSPRC. ConnectiCare did not retain the recovery right to S.W.'s claim.

345.    Defendants indemnified its insured tortfeasor and made payments pursuant to a settlement with S.W. By virtue of entering into that settlement and obtaining a release of all claims, Defendants became a primary payer responsible for reimbursement of S.W.'s accident-related medical expenses.

346.    Despite knowing S.W. was Medicare eligible and that Medicare or an MAO would likely have a lien, Defendants decided to settle with S.W., without making any effort to reach out to

determine whether Medicare or an MAO made payments and ensure it was reimbursed.

347. Following this settlement, Defendants reported to CMS regarding the accident, the name of the reporting entity, the type of insurance policy involved, and the policy number, and admitted its primary payer status requiring it to pay or reimburse S.W.'s accident-related medical expenses.

348. Despite reporting it was a primary payer by way of a liability settlement, and making the corresponding admission it should have paid for S.W.'s accident-related injuries, Defendants failed to remit or reimburse such payments.

349. In the time since the incident, Defendants have enjoyed the use of ConnectiCare's funds to the detriment of the Medicare system. Defendants have made no remedial attempts to reimburse.

350. Because Defendants failed to inform MSPRC or its assignors about this settlement, MSPRC was forced to search in the dark for the insurer responsible for the unreimbursed claims. The S.W. claim is just one example of this ongoing pattern.

351. Accordingly, MSPRC is entitled to collect double damages against Defendants for its failure to reimburse ConnectiCare's conditional payment for S.W.'s accident-related medical expenses.

**L.M.**

352. On or around June 13, 2017, L.M. was enrolled in a Medicare Advantage Plan issued by ConnectiCare, an MAO and MSPRC's Designated Series assignor in this action, pursuant to CMS Contract ID Number H3528.

353. On or around June 13, 2017, L.M. was injured in an incident. As a direct and proximate result of the incident, L.M. sustained injuries that required medical items and services.

354. Defendants insured the party responsible for the incident under policy number

172831142. L.M. was covered under that liability policy.

355.    The medical services were rendered on June 13, 2017. The medical providers subsequently issued bills for payment of L.M.'s accident-related medical expenses to ConnectiCare. The medical providers billed and charged ConnectiCare $1,299.94 for L.M.'s accident-related medical expenses, of which ConnectiCare paid $361.33 on June 22, 2017 and June 29, 2017.

356.    At the time ConnectiCare executed its assignment agreement in favor of MSP Recovery LLC, ConnectiCare's right to seek reimbursement for L.M.'s accident-related treatment was never assigned to or pursued by other recovery vendors. ConnectiCare held all recovery rights to L.M.'s accident-related treatment and conveyed them to MSPRC. ConnectiCare did not retain the recovery right to L.M.'s claim.

357.    Defendants indemnified its insured tortfeasor and made payments pursuant to a settlement with L.M. By virtue of entering into that settlement and obtaining a release of all claims, Defendants became a primary payer responsible for reimbursement of L.M.'s accident-related medical expenses.

358.    Despite knowing L.M. was Medicare eligible and that Medicare or an MAO would likely have a lien, Defendants decided to settle with L.M., without making any effort to reach out to determine whether Medicare or an MAO made payments and ensure it was reimbursed.

359.    Following this settlement, Defendants reported to CMS regarding the accident, the name of the reporting entity, the type of insurance policy involved, and the policy number, and admitted primary payer status requiring payment or reimbursement of L.M.'s accident-related medical expenses.

360.    Despite reporting primary payer status by way of a liability settlement, and making the corresponding admission they should have paid for L.M.'s accident-related injuries, Defendants failed to remit or reimburse such payments.

361. In the time since the incident, Defendants have enjoyed the use of ConnectiCare's funds to the detriment of the Medicare system. Defendants have made no remedial attempts to reimburse.

362. Because Defendants failed to inform MSPRC or its assignors about this settlement, MSPRC was forced to search in the dark for the insurer responsible for the unreimbursed claims. The L.M. claim is just one example of this ongoing pattern.

363. Accordingly, MSPRC is entitled to collect double damages against Defendants for the failure to reimburse ConnectiCare's conditional payment for L.M.'s accident-related medical expenses.

**R.D.**

364. On or around April 23, 2020, R.D. was enrolled in a Medicare Advantage Plan issued by HEAL, an MAO and MSPRC's Designated Series assignor in this action, pursuant to CMS Contract ID Number H1463.

365. On or around April 23, 2020, R.D. was injured in an incident. As a direct and proximate result of the incident, R.D. sustained injuries that required medical items and services.

366. Defendants insured the party responsible for the incident under policy number 206743663. R.D. was covered under that liability policy.

367. The medical services were rendered on April 23, 2020 and April 29, 2020. The medical providers subsequently issued bills for payment of R.D.'s accident-related medical expenses to HEAL. The medical providers billed and charged HEAL $32,990.54 for R.D.'s accident-related medical expenses, of which HEAL paid $3,032.41 between May 3, 2020 and July 10, 2020.

368. At the time HEAL executed its assignment agreement in favor of MSP Recovery LLC, HEAL's right to seek reimbursement for R.D.'s accident-related treatment was never assigned to or pursued by other recovery vendors. HEAL held all recovery rights to R.D.'s accident-related

treatment and conveyed them to MSPRC. HEAL did not retain the recovery right to R.D.'s claim.

369.     Defendants indemnified the insured tortfeasor and made payments pursuant to a settlement with R.D. By virtue of entering into that settlement and obtaining a release of all claims, Defendants became a primary payer responsible for reimbursement of R.D.'s accident-related medical expenses.

370.     Despite knowing R.D. was Medicare eligible and that Medicare or an MAO would likely have a lien, Defendants decided to settle with R.D., without making any effort to reach out to determine whether Medicare or an MAO made payments and ensure it was reimbursed.

371.     Following this settlement, Defendants reported to CMS regarding the accident, the name of the reporting entity, the type of insurance policy involved, and the policy number, and admitted primary payer status requiring payment or reimbursement of R.D.'s accident-related medical expenses.

372.     Despite reporting primary payer status by way of a liability settlement, and making the corresponding admission they should have paid for R.D.'s accident-related injuries, Defendants failed to remit or reimburse such payments.

373.     In the time since the incident, Defendants have enjoyed the use of HEAL's funds to the detriment of the Medicare system. Defendants have made no remedial attempts to reimburse.

374.     Because Defendants failed to inform MSPRC or its assignors about this settlement, MSPRC was forced to search in the dark for the insurer responsible for the unreimbursed claims. The R.D. claim is just one example of this ongoing pattern.

375.     Accordingly, MSPRC is entitled to collect double damages against Defendants for the failure to reimburse HEAL's conditional payment for R.D.'s accident-related medical expenses.

**S.D.**

376.     On or around April 23, 2020, S.D. was enrolled in a Medicare Advantage Plan issued

by HEAL, an MAO and MSPRC's Designated Series assignor in this action, pursuant to CMS Contract ID Number H1463.

377.  On or around April 23, 2020, S.D. was injured in an incident. As a direct and proximate result of the incident, S.D. sustained injuries that required medical items and services.

378.  Defendants insured the party responsible for the incident under policy number 206743663. S.D. was covered under that liability policy.

379.  The medical services were rendered between April 23, 2020 and May 18, 2020. The medical providers subsequently issued bills for payment of S.D.'s accident-related medical expenses to HEAL. The medical providers billed and charged HEAL $36,849.54 for S.D.'s accident-related medical expenses, of which HEAL paid $3,835.93 between May 3, 2020 and July 17, 2020.

380.  At the time HEAL executed its assignment agreement in favor of MSP Recovery LLC, HEAL's right to seek reimbursement for S.D.'s accident-related treatment was never assigned to or pursued by other recovery vendors. HEAL held all recovery rights to S.D.'s accident-related treatment and conveyed them to MSPRC. HEAL did not retain the recovery right to S.D.'s claim.

381.  Defendants indemnified its insured tortfeasor and made payments pursuant to a settlement with S.D. By virtue of entering into that settlement and obtaining a release of all claims, Defendants became a primary payer responsible for reimbursement of S.D.'s accident-related medical expenses.

382.  Despite knowing S.D. was Medicare eligible and that Medicare or an MAO would likely have a lien, Defendants decided to settle with S.D., without making any effort to reach out to determine whether Medicare or an MAO made payments and ensure it was reimbursed.

383.  Following this settlement, Defendants reported to CMS regarding the accident, the name of the reporting entity, the type of insurance policy involved, and the policy number, and admitted primary payer status requiring payment or reimbursement of S.D.'s accident-related medical

expenses.

384.     Despite reporting primary payer status by way of a liability settlement, and making the corresponding admission they should have paid for S.D.'s accident-related injuries, Defendants failed to remit or reimburse such payments.

385.     In the time since the incident, Defendants have enjoyed the use of HEAL's funds to the detriment of the Medicare system. Defendants have made no remedial attempts to reimburse.

386.     Because Defendants failed to inform MSPRC or its assignors about this settlement, MSPRC was forced to search in the dark for the insurer responsible for the unreimbursed claims. The S.D. claim is just one example of this ongoing pattern.

387.     Accordingly, MSPRC is entitled to collect double damages against Defendants for the failure to reimburse HEAL's conditional payment for S.D.'s accident-related medical expenses.

**S.B.**

388.     On or around February 26, 2021, S.B. was enrolled in a Medicare Advantage Plan issued by BCBSRI, an MAO and MSPRC's Designated Series assignor in this action.

389.     On or around February 26, 2021, S.B. was injured in an incident. As a direct and proximate result of the incident, S.B. sustained injuries that required medical items and services.

390.     Defendants insured the party responsible for the incident. S.B. was covered under that liability policy.

391.     The medical services were rendered on February 26, 2021. The medical providers subsequently issued bills for payment of S.B.'s accident-related medical expenses to BCBSRI. The medical providers billed and charged BCBSRI $15,221.98 for S.B.'s accident-related medical expenses, of which BCBSRI paid $1,456.27 between March 8, 2021 and March 30, 2021.

392.     At the time BCBSRI executed its assignment agreement in favor of MSP Recovery LLC, BCBSRI's right to seek reimbursement for S.B.'s accident-related treatment was never assigned

to or pursued by other recovery vendors. BCBSRI held all recovery rights to S.B.'s accident-related treatment and conveyed them to MSPRC. BCBSRI did not retain the recovery right to S.B.'s claim.

393.    Defendants indemnified its insured tortfeasor and made payments pursuant to a settlement with S.B. By virtue of entering into that settlement and obtaining a release of all claims, Defendants became a primary payer responsible for reimbursement of S.B.'s accident-related medical expenses.

394.    Despite knowing S.B. was Medicare eligible and that Medicare or an MAO would likely have a lien, Defendants decided to settle with S.B., without making any effort to reach out to determine whether Medicare or an MAO made payments and ensure it was reimbursed.

395.    Following this settlement, Defendants reported to CMS regarding the accident, the name of the reporting entity, the type of insurance policy involved, and the policy number, and admitted primary payer status requiring payment or reimbursement of S.B.'s accident-related medical expenses.

396.    Despite reporting primary payer status by way of a liability settlement, and making the corresponding admission they should have paid for S.B.'s accident-related injuries, Defendants failed to remit or reimburse such payments.

397.    In the time since the incident, Defendants have enjoyed the use of BCBSRI's funds to the detriment of the Medicare system. Defendants have made no remedial attempts to reimburse.

398.    Because Defendants failed to inform MSPRC or its assignors about this settlement, MSPRC was forced to search in the dark for the insurer responsible for the unreimbursed claims. The S.B. claim is just one example of this ongoing pattern.

399.    Accordingly, MSPRC is entitled to collect double damages against Defendants for the failure to reimburse BCBSRI's conditional payment for S.B.'s accident-related medical expenses.

## TOLLING OF THE STATUTE OF LIMITATIONS

### Equitable Estoppel

400.    Defendants have been under a continuous duty to identify and coordinate benefits with MAOs, including the MAO Assignor, and to provide proper notice to CMS of their primary payer status to ensure that conditional payments made on behalf of Medicare beneficiaries are reimbursed.

401.    Defendants knowingly, affirmatively, and actively concealed or recklessly disregarded their obligations to the MAO Assignor and, therefore, are estopped from relying on any statute of limitations in defense of this action.

### Class Action Tolling

402.    Any applicable statute of limitations was tolled during the pendency of a prior class action.

403.    Specifically, the claims made in this action were tolled by the pendency of this case and *MSP Recovery Claims, Series, LLC, et al. v. Progressive American Ins. Co.*, Case No. 1:18-cv-02273.

404.    Plaintiff is now entitled to bring all claims relating back to the filing of the above-mentioned class actions.


### COUNT I
### Private Cause of Action Under 42 U.S.C. § 1395y(b)(3)(A) for Settlement Claims
### (Seeking the MAO Assignor's Unreimbursed Conditional Payments)

405.    Plaintiff re-alleges and incorporates herein by reference each of the allegations contained in the preceding paragraphs 1-414 as if fully set forth herein.

406.    Plaintiff asserts a private cause of action pursuant to 42 U.S.C. § 1395y(b)(3)(A).

407.    Defendants are primary plans for the Settlement Claims.

408.    Plaintiff's MAO Assignors, as part of providing Medicare benefits under the Medicare Advantage program, paid for accident-related items and services that were reasonable and necessary

and which were also covered by a third-party policy that provided bodily injury coverage for accident-related medical expenses or by a first-party policy that provided UM or UIM coverage. The medical items and services (medical bills paid) that were incurred by the MAO Assignors were incurred as a direct result of the accident or incident that Defendants either insured or which Defendants settled a claim with those same Medicare beneficiaries.

409. The MAO's Medicare beneficiaries made claims against Defendants' third-party policies to recover the medical expenses the MAO Assignors paid for items and services that were reasonable, necessary, and related to an accident. Defendants entered into settlements with the MAO Assignors' beneficiaries relating to accidents but failed to reimburse the MAO Assignors for accident-related medical expenses paid by the Assignors.

410. Defendants have a nondelegable duty to reimburse the MAO Assignors for payments the Assignors made for medical expenses related to an accident. Defendants are responsible for reimbursement of these accident-related medical expenses, even if it subsequently paid out the maximum benefits under the policies.

411. Defendants have and had a demonstrated responsibility to reimburse accident-related secondary payments relating to the Settlement Claims but failed to do so causing Plaintiff's MAO Assignors' damages. Defendants' responsibility to reimburse the MAO Assignors for the Settlement Claims conditional payments is demonstrated by the fact that Defendants entered into settlements with respect to the accidents with the MAO Assignors' enrollees.

412. To the extent it was necessary, Defendants failed to administratively appeal the MAO Assignors' rights to reimbursement within the administrative remedies period. Defendants, therefore, are time-barred from challenging the propriety, reasonableness, and necessity of the amounts paid.

413. Defendants were required to timely reimburse the MAO Assignors for conditional payments of the Assignors' Medicare beneficiaries' accident-related medical expenses.

414.    Defendants derived substantial monetary benefit by placing the burden of financing medical treatments on the MAO Assignors in violation of the MSP Act and to the detriment of the Medicare program.

415.    Plaintiff seeks to recoup only those medical items or services provided to the MAO Assignors' Medicare beneficiary enrollees that were related to accidents covered by Defendants' insurance policies.

416.    Plaintiff brings this claim pursuant to 42 U.S.C. § 1395y(b)(3)(A) for reimbursement of Plaintiff's MAO Assignors' secondary payments and to recover statutory double damages from Defendants for their failure to make appropriate and timely reimbursement of conditional payments for Medicare beneficiaries' accident-related medical expenses.

**COUNT II**
**Private Cause of Action Under 42 U.S.C. § 1395y(b)(3)(A) for First-Party**
**Claims**
**(Seeking the MAO Assignors' Unreimbursed Conditional Payments)**

417.    Plaintiffs re-alleges and incorporates herein by reference each of the allegations contained in the preceding paragraphs 1-414 as if fully set forth herein.

418.    Plaintiff asserts a private cause of action pursuant to 42 U.S.C. § 1395y(b)(3)(A).

419.    Defendants are the primary plan for the First-Party Claims.

420.    Defendants have a demonstrated responsibility to reimburse accident-related secondary payments relating to the First-Party Claims but failed to do so.

421.    With respect to the First Party Policy Claims, the MAO Assignors, while providing Medicare benefits under the Medicare Advantage program, paid for accident-related medical items and services that were reasonable and necessary and that were also covered by no-fault, PIP, or MedPay policies issued by Defendants that provided medical coverage for accident-related medical expenses. The MAO Assignors' payments were conditional payments.

422.    Defendants' responsibility to reimburse the MAO Assignors for the First Party Claims

conditional payments is demonstrated by either the issuance of the policy providing coverage of the MAO Assignors' enrollees or by Defendants' assuming ongoing responsibility for the medical expenses of the MAO Assignors' enrollee arising out of the accident.

423.    Because Defendants were a primary payer—as established by the insurance policy or payment of one or more medical expenses or items—Defendants had a nondelegable duty with respect to the First Party Policy Claims to reimburse the MAO Assignors for accident-related medical expenses paid by the MAO Assignors.

424.    Defendants were required to timely reimburse the MAO Assignors for conditional payments of the Assignors' Medicare beneficiaries' accident-related medical expenses.

425.    The MAO Assignors suffered damages as a direct result of Defendants' failure to comply with its statutory and regulatory duties under the MSP Act and the corresponding regulations within the Code of Federal Regulations.

426.    Defendants derived substantial monetary benefit by placing the burden of financing medical treatments on the MAO Assignors in violation of the MSP Act and to the detriment of the Medicare program.

427.    To the extent it was necessary, Defendants failed to administratively appeal the MAO Assignors' rights to reimbursement within the administrative remedies period. Defendants are, therefore, time-barred from challenging the propriety, reasonableness, and necessity of the amounts paid.

428.    Plaintiff seeks to recoup only those medical items or services provided to the MAO Assignors' Medicare beneficiary enrollees that were related to motor vehicle accidents covered by Defendants' insurance policies.

429.    Plaintiff brings this claim pursuant to 42 U.S.C. § 1395y(b)(3)(A), for reimbursement of its MAO Assignors' secondary payments and to recover statutory double damages from Defendants

for their failure to make appropriate and timely reimbursement of conditional payments for Medicare beneficiaries' accident-related medical expenses.

### COUNT III
### Breach of Contract for Failure to Pay Benefits for the Contractual Claims
### (Seeking the MAO Assignor's Unreimbursed Conditional Payments)

430.    Plaintiff re-allege and incorporate herein by reference the allegations contained in the preceding paragraphs 1-414 as if fully set forth herein.

431.    Plaintiff alleges certain claims here by way of subrogation.

432.    At all material times, the MAO Assignors provided health insurance to Medicare beneficiaries, including those set forth in the examples above.

433.    The MAO Assignors are subrogated to the right to recover from Defendants, in all instances in which Defendants are a primary plan, for Defendants' failure to make primary payment or reimbursement to the MAO Assignors for accident-related medical expenses.

434.    The MAO Assignors paid for their enrolled Medicare beneficiaries' accident-related medical expenses in amounts to be proven at trial, pursuant to their agreements with CMS.

435.    Defendants failed or refused to make primary payments of no-fault insurance benefits, or medical-payment benefits, as Defendants were obligated to do.

436.    Defendants' failure to pay or make timely reimbursement for the MAO Assignors' enrolled Medicare beneficiaries' accident-related medical expenses has caused the MAO Assignors damages, as set forth here, in amounts to be proven at trial.

437.    To the extent necessary and not otherwise preempted by federal statute or regulation, Plaintiff complied with all applicable conditions precedent to the institution of this claim for reimbursement.

438.    For the First Party Claims, including those where Defendants issued policies in states where no-fault coverage is mandatory, as well as states where first-party medical coverage is optional,

Defendants have a contractual obligation to pay benefits under a first-party policy that covered medical expenses.

### COUNT IV
### Declaratory Relief Pursuant to 28 U.S.C. § 2201
### (As Related to the MAO Assignor's Unreimbursed Payments)

439.    Plaintiff re-alleges and incorporates by reference each of the allegations contained in the preceding paragraphs 1-414 as if fully set forth here.

440.    Defendants are required to identify and coordinate benefits relating to any secondary payments that the MAO Assignors made. Defendants, however, have refused to disclose important information relating to claims made under first-party policies. This inaction has caused and will cause a bona fide present controversy between the parties concerning Defendants' obligations under the MSP Act.

441.    Specifically, there is a bona fide, actual, present, and practical need among the parties for a judicial declaration that:

a.      Defendants must determine whether their insureds are also covered by the MAO Assignors, and if so, then, Defendants must coordinate benefits with the MAOs;

b.      Defendants must alert the MAO Assignors of Defendants' primary payer obligations;

c.      Unlike healthcare providers lawfully rendering treatment to an injured person for bodily injury covered by PIP insurance, the MAO Assignors are not obligated to submit a demand for reimbursement on a properly completed 1500 Claim Form, UB 92 Form, or any other standard form under any relevant no-fault statute; and

d.      Secondary Payers are not obligated to comply with the strict requirements of any applicable no-fault statute, when seeking reimbursement demands and that:

i.     Defendants must notify the MAO of the name of the insured upon which such benefits are primary;

ii.     the MAO is not required to provide a standard "assignment" typically given to providers by insureds; and

iii.     Defendants must notify the MAO of the claim number or policy number upon which such claim was originally submitted to Defendants.

442.     The determination of what amounts are owed by Defendants to Plaintiff's MAO Assignors is complicated and difficult.

443.     A coordination-of-benefits process requires plans to share information between the primary payer and secondary plan and to act in good faith.

444.     The Code of Federal Regulations defines the coordination of benefits system as a "coordination of benefits transaction."[20]

445.     The coordination of benefits transaction involves the exchange of thousands of claims data and data points between the parties to determine overlapping instances where Plaintiff's MAO Assignors made payment of medical items and services on behalf of a Medicare beneficiary who was entitled to the benefit of insurance coverage provided by Defendants. This includes not only instances in which a Medicare beneficiary was directly insured by Defendants, but also instances in which a Medicare beneficiary was injured by a third party insured by Defendants' policy or falling under the Medicare beneficiary's UM/UIM coverage.

446.     The exchange of claims data may be accomplished by extracting and producing certain data fields from Defendants' and Plaintiff's databases by using demographic identifiers, such as Social Security Number ("SSN"), Health Insurance Claim Number ("HICN"),[21] date of birth, sex, and address. Beneficiary matching pinpoints the number of relevant insureds and simplifies the process of

_____

[20] The "coordination of benefits transaction" is the transmission from any entity to a health plan for the purpose of determining the relative payment responsibilities of the health plan, of either of the following for health care: (a) claims and (b) payment information. 45 C.F.R. § 162.1801.
[21] Also known as a Medicare Beneficiary Identifier ("MBI").

identifying reimbursable claims, which is done by matching the date of loss (for Defendants), with dates of payment (for Plaintiff), and then discovering what Defendants reimbursed (if anything), and to whom.

447.    Given the magnitude of the claims and data points being exchanged between the parties, the coordination of benefits transaction is complex.

448.    Thus, Plaintiff lacks an adequate legal remedy to obtain the requested information.

## **JURY TRIAL DEMAND**

Plaintiff demands a trial by jury on all of the triable issues within this pleading.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff seeks a judgment granting the following relief:

a.    A judgment for any secondary payments made by Plaintiff's MAO Assignors which Defendants should have paid based on their primary payer status for First Party Policy Claims and Settlement Claims.

b.    A judgment awarding double damages for those amounts to which Plaintiff is entitled to reimbursement as allowed under 42 U.S.C. § 1395y(b)(3)(A);

c.    In the alternative, a declaratory judgment for the relief requested in Count IV;

d.    A judgment awarding Plaintiff pre-judgment and post-judgment interest;

e.    Attorneys' fees as may be allowed under any applicable law;

f.    Tolling of any applicable statute of limitations for First Party Policy Claims and Settlement Claims;

g.    A judgment awarding Plaintiff such other and further relief as the Court deems just and proper under the circumstances.

Dated: November 26, 2024              Respectfully submitted,

                                      /s/ Mark E. Silvey
                                      Mark E. Silvey
                                      Milberg Coleman Bryson Phillips Grossman, PLLC
                                      800 South Gay Street, Suite 1100
                                      Knoxville, TN 37929
                                      Tel.: 865-247-0080
                                      msilvey@milberg.com

                                      Jimmy W. Mintz
                                      *Pro Hac Vice*
                                      Milberg Coleman Bryson Phillips Grossman, PLLC
                                      201 Sevilla Avenue, 2nd Floor
                                      Coral Gables, FL 33134
                                      Tel.: (786) 879-8200
                                      Fax: (786) 879-7572
                                      jmintz@milberg.com